PERCIVAL GASSETT *vs.* GEORGE M. GLAZIER.

Suffolk. January 7, 1896. — March 11, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, & LATHROP, JJ.

*Contract — Law and Fact — Rescission — Fraud — Action.*

Where the terms of a contract, to be gathered from talk between the parties on more than one occasion, are not so clear and distinct as to be uncontroverted, the question what the contract was should be submitted to the jury as one of fact.

An action, the declaration in which contains a count in tort based on fraud in a contract of sale, the averment of which is limited to a misrepresentation of the cost to the defendant of the property sold, and a count in contract for breach of the contract of sale, both of which counts rest on the ground of an attempted

rescission of the contract, and seek to recover back the whole of the purchase money, if the defendant cannot be restored to his original position, cannot be maintained.

TORT, or contract. The declaration contained four counts, the first of which alleged that in January and February, 1893, the defendant was the owner of certain shares of stock in the Mattison Drug Company, a corporation organized under the laws of the State of Maine, and, in order to induce the plaintiff to purchase certain of said shares, offered to sell to the plaintiff one hundred shares at the same price that the defendant had paid therefor, and represented that he had paid for them the sum of fifty dollars per share; that the representation was false, and the defendant had paid therefor a sum not exceeding twenty-three dollars per share; that the defendant knew that the representation was false, and made the same for the purpose of deceiving and defrauding the plaintiff thereby, and intended that the plaintiff should be deceived, and should act thereon; that the plaintiff was ignorant of the falsity of the representation, and believed the same to be true, and, by reason of such belief, purchased the one hundred shares of the defendant, and paid therefor the sum of five thousand dollars on February 27, 1893; and that subsequently the plaintiff learned the falsity of the representation, and on March 10, 1893, tendered to the defendant a reconveyance of the shares so purchased, and demanded back the sum of five thousand dollars, which reconveyance the defendant refused to accept, and refused to pay him said sum of five thousand dollars, or any part thereof.

The second count alleged that the defendant was the owner of certain other shares of stock in the Mattison Drug Company, and as an inducement to the plaintiff to purchase certain of said shares the defendant represented that theretofore he had purchased from one E. F. Mattison a one-half interest in the drug business of Mattison, and had paid therefor the sum of $12,500; that thereafter the defendant and Mattison had conveyed the business to the Mattison Drug Company for the capital stock of the corporation, namely, five hundred shares of one hundred dollars each, two hunded and fifty shares of which were delivered to the defendant and the remaining two hundred and fifty shares to Mattison; that the defendant thereupon offered to sell to the

plaintiff one hundred shares of stock in the corporation at the same price that he had given for the same, which price the defendant represented as above was the sum of fifty dollars per share; and that the representation of the defendant as to the price that he had paid Mattison for the one-half interest in the business was false, and the defendant had paid for such interest a sum not exceeding $5,500. The remaining allegations followed those of the first count.

The third count set out the defendant's ownership of the shares, and alleged that, as an inducement to the plaintiff to purchase certain of said shares, the defendant promised the plaintiff that, if he would purchase one hundred shares from him, the defendant would sell the shares to him at the same price that the defendant had paid therefor, which price he then represented was the sum of fifty dollars per share; that the plaintiff, relying upon the promise of the defendant, purchased the one hundred shares, and paid the defendant therefor the sum of five thousand dollars on February 27, 1893; that the representation was false, in that the defendant had not paid for the shares the sum of fifty dollars per share, but had paid therefor a sum not exceeding twenty-three dollars per share; that the plaintiff was ignorant of the falsity of the representation, and believed the same to be true; and that the defendant had not performed his promise to sell the shares to the plaintiff at the price which the defendant paid therefor, but sold the shares to the plaintiff at a much greater price. The count then set out the tender by the plaintiff of a reconveyance of the shares, and a demand for repayment of the sum paid by him, and a refusal by the defendant, as in the other counts.

The fourth count was upon an account annexed to recover the amount paid by the plaintiff to the defendant for the shares in excess of the agreed price. Answer, a general denial. Writ dated June 27, 1893.

Trial in the Superior Court, before *Mason*, C. J., who allowed a bill of exceptions, in substance as follows.

The plaintiff testified, among other things, as follows:

"I am a stockholder in and the treasurer of the Mattison Drug Company, a corporation under the laws of the State of Maine, and have been such treasurer since February 27, 1893.

In the spring of 1892, I was looking for a business to go into. I was out of business and advertised in a paper, and through that advertisement first met the defendant.

" In January, 1893, the defendant told me he had a business he thought would interest me, and asked me to call at his office, which I did on January 28, 1893, and he then briefly outlined the business, and said it was a drug business ; he said I could get in very cheaply, it would only cost me five thousand dollars, and asked me to make an appointment to meet him later. So I appointed January 30, and I called then, and he told me that his son was sick, and that was one of his principal reasons for withdrawing from the treasurership, and if he could get out of the treasurership and get a responsible man in his place, and he thought from what I said I filled the bill, he would take his son south, and then also he had other things on hand. He said the capital of the corporation was fifty thousand dollars, and Mattison was president, and he had given his son twenty shares so he could be a director, and he himself was treasurer, and the two directors could outvote Mattison any time; and he went on to say that of course the treasurership was the position I should have, and the salary of both president and treasurer was twelve hundred dollars apiece. So I said, ' Well, if I go into this thing at all, I will only do so on the understanding that I pay no premium on the stock, and come in on the ground floor,' and he said, ' Certainly, you shall have the stock at what it cost me,' and then added, ' That will give you ten thousand dollars worth.' I said, ' That is fifty cents on the dollar then.' He said, ' Yes.' ' Well,' I said, ' that on fifty thousand dollars won't give me any vote at all, it will only give me a fifth.' He said, ' I have no doubt that Mattison would sell you some of his; would n't you like to go down to Providence and see him ? ' I said, ' I will go down '; so we made an appointment and went to Providence together, I think, February 2. At Providence I said to Mattison, ' Will you sell me enough of that stock to make up one third with what Glazier will sell me, on the same understanding, the twenty-five thousand dollars basis ? ' That was as far as I got when the defendant interrupted, saying, ' Oh, yes, certainly, that will be all right, we understand that,' or something, and Mattison just figured on a little piece of pa-

per, and said he would sell me the stock at that price. I then said, ' Well, I have n't seen the books yet,' and we agreed to meet in Boston on the 4th, at the defendant's office, where the company had desk room.

" On my return from Providence with the defendant, he said to me, ' The way of it was this: we had the business valued by an expert; he called it worth twenty-five thousand dollars, and I bought half, and then we turned it into a stock company, and made the capital fifty thousand dollars.'

" On February 4, Mattison, the defendant, and I met at the defendant's office, and the books were produced. I asked for the trial balance, so I could see the state of the business; they said the books were simple entry books, and they had n't any balance, but they could tell me what I wanted to know; so they all stood over me, and I could n't seem to find out anything at all about the business. I finally took off the gross statement of the amount of business done since the company had been formed, which was six months, and found that there had been a falling off, but they said they really had n't got started then. The defendant said he would not sell his position, nor give up his position, for less than five thousand dollars anyway. I did not learn anything very definite from examination of the books, they were in such a condition. I was not permitted to examine the books by myself. I did n't see the defendant again until I had agreed to go into the business with Mattison.

" On February 8, I drew my checks, one for five thousand dollars for the defendant, and another one for Mattison on a bank in Wyoming, and it was agreed that the checks and the certificates of stock should be delivered to the president of the Bank of the Republic in Boston, and when he collected the money he should turn it over to the defendant and Mattison, and the certificates should be handed to me. On the 27th of February I had notice that the certificates were waiting for me."

A check for five thousand dollars, dated February 8, 1893, drawn by the plaintiff to the order of the defendant and indorsed by him, was put in evidence, and a certificate of stock in the Mattison Drug Company, in the name of the plaintiff, for one hundred shares, dated February 8, 1893, was also put in evidence.

The plaintiff further testified as follows:

" On February 27 the defendant resigned, and I was elected treasurer, and, on March 1, I was left alone with the books for the first time, and the defendant or his son also handed me two statements showing the assets and liabilities of the company, and I found then that the liabilities exceeded the assets.

" On March 4, I received a hint to the effect that the defendant had made enough out of me so that his remaining stock had cost him only five hundred dollars ; this was the first that my attention was directed to the fact that he had charged me a greater price for the stock than it had cost him.   I immediately endeavored to learn from Mattison what the defendant had paid him for the stock, but was unable to learn anything from him ; he declined to tell me.   I went to the defendant, taking the certificate of stock with me, and said, ' You have misrepresented the state of the business, and you sold me the stock at a greater price than you agreed to,' and ' Here is the certificate you sold me.   Give me back my money.'   He said he would not do it. This was on March 11:   I said, ' Do you refuse to return me my money ? ' and he said, ' Yes, I do.'

" I first learned the price the defendant had actually paid Mattison for his interest in the business when I first saw the original bill of sale which was produced after this suit had been begun."

The original bill of sale was put in evidence, and recited the consideration to be $5,500.

On cross-examination, the plaintiff testified that, at the time of the tender of his stock, on March 11, to the defendant, he had no absolute knowledge of what the defendant had paid for it ; that between March 4, when he received the hint with regard to the amount paid by the defendant for the stock, and March 11, he had received and opened the letters of the company ; that he never asked the defendant how much the profit on the business was ; that his being elected treasurer of the company, and having the salary, was a part of the trade ; that between March 11 and April, 1893, he did not attend to the company's affairs ; and that he had drawn as salary about fifty dollars a month from the company, about half of the amount to which he was entitled.

On redirect examination, the plaintiff testified that after

March 11, 1893, he declined to have anything more to do with the company, and did not have anything to do with it until April, 1893, and after his counsel had informed him that the defendant's counsel had agreed with him that he might resume his duties as treasurer, and continue to act as such without prejudice to any rights he might have against the defendant.

From the defendant's answer to interrogatories it appeared that the cost of the shares to him was the money paid by him to Mattison for the one-half interest in the business, which was $5,500, with the expenses incurred in the formation of the company.

The judge ruled that there was no evidence on which the jury could find a verdict for the plaintiff on any of the counts of his declaration, and directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

*L. S. Dabney & E. M. Parker,* for the plaintiff.

*S. J. Elder & E. A. Whitman,* for the defendant.

ALLEN, J.   The fourth count is on an account annexed, for the amount paid by the plaintiff to the defendant in excess of the agreed price.   There was some evidence tending to show that the agreement of sale was that the plaintiff should have the shares at cost.   At the outset of the negotiations, according to his testimony, he said to the defendant, " If I go into this thing at all, I will only do so on the understanding that I pay no premium on the stock, and come in on the ground floor ", and the defendant replied, " Certainly, you shall have the stock at what it cost me."   There was some evidence tending to show that the subsequent negotiations proceeded on this basis, and that the defendant afterwards explained to the plaintiff how the cost was arrived at, with reference to fixing the sum which the plaintiff was to pay.   According to the plaintiff's testimony, the defendant said, " The way of it was this : we had the business valued by an expert ; he called it worth twenty-five thousand dollars, and I bought half, and then we turned it into a stock company, and made the capital fifty thousand dollars."   And still later, when the plaintiff was seeking to rescind the contract and get back the whole of his money, he put his claim in part on the ground of such a contract.   He said to the defendant, " You sold me the stock at a greater price than you agreed to " ; and the defendant did not in terms deny the con-

tract, though he refused to pay back the money which was demanded, that is, the whole of the money which he had received.

The distinction may be rather nice between an agreement to sell at cost, when the cost is represented to be a certain sum, and an agreement to sell at a certain sum, which sum is represented to have been the cost. This distinction however exists, and it would be more marked if at the time of entering into the agreement of sale the vendor should not fix or know the exact cost, and the parties should leave it to be ascertained afterwards. In the present case, the words used admit of the construction that the plaintiff was to have the stock at its cost to the defendant. *Willard* v. *Randall,* 65 Maine, 81. *Barnard* v. *Colwell,* 39 Mich. 215.

It is contended that the construction of the words used is for the court; and so it is, where an oral contract is distinct in its terms. But where a contract is to be gathered from talk between the parties, and especially from talk on more than one occasion, the question what the contract was, if controverted, must usually be tried by the jury as a question of fact. *Globe Works* v. *Wright,* 106 Mass. 207, 216. *Camerlin* v. *Palmer Co.* 10 Allen, 539. *Perkins* v. *Hinsdale,* 97 Mass. 157. *Thruston* v. *Thornton,* 1 Cush. 89. In this case it could hardly be said that the terms of the contract of sale were clear and distinct, so as to be uncontroverted. The plaintiff was entitled to go to the jury on the fourth count.

The first three counts all rest on the ground of an attempted rescission, and seek to recover back the full sum paid by the plaintiff to the defendant for the shares. But the plaintiff could not rescind the contract of purchase, because the defendant could not be restored to his former position. He resigned his office as treasurer of the company, and the plaintiff was chosen in his place, and the plaintiff did not tender his resignation or offer to do anything towards restoring the defendant to that position. He held the office several weeks before the counsel made the arrangement as to his continuing to serve as treasurer. The facts show no effectual rescission. *Marston* v. *Singapore Rattan Co.* 163 Mass. 296. *Snow* v. *Alley,* 144 Mass. 546.

The first two counts are treated by both parties as counts in tort, based on fraud. They seek, however, to recover back the

whole of the purchase money, upon a rescission. This ground of action is virtually for money had and received. *Kimball* v. *Cunningham*, 4 Mass. 502. *Conner* v. *Henderson*, 15 Mass. 319. *Perley* v. *Balch*, 23 Pick. 283, 286. *Dorr* v. *Fisher*, 1 Cush. 271, 273, 274. The evidence of fraud, moreover, somewhat outran the averments. Upon these counts as they stood, the ruling that the plaintiff could not recover upon them was right, both because they rest only on the ground of a rescission, and because the averment of fraud was limited to a misrepresentation of the cost of the stock to the defendant, which is not actionable. *Hemmer* v. *Cooper*, 8 Allen, 334. *Manning* v. *Albee*, 11 Allen, 520. *Mooney* v. *Miller*, 102 Mass. 217. *Cooper* v. *Lovering*, 106 Mass. 77. *Parker* v. *Moulton*, 114 Mass. 99. *Poland* v. *Brownell*, 131 Mass. 138, 142. We do not, however, determine that the evidence was insufficient to show an actionable fraud.

*Exceptions sustained.*