## MANTI CITY SAVINGS BANK v. PETERSON et al.

No. 1875. Decided January 10, 1908 (93 Pac. 566).

1. CONTRACTS — ORAL CONTRACTS — CONSTRUCTION — QUESTIONS FOR COURT AND JURY. Where the terms of an oral contract are precise and explicit, the language clear and unequivocal, and there is nothing doubtful or ambiguous about it requiring explanation by resorting to extraneous circumstances, the court should leave to the jury merely the question of its existence, as testified to, and not the question of its effect.

2. TRIAL—INSTRUCTIONS—MATTERS NOT IN ISSUE. The giving of an instruction as to estoppel, the question of estoppel not being raised by the pleadings or evidence, is error.

3. REPLEVIN—MISLEADING INSTRUCTIONS. Where defendants leased sheep to T., and T. mortgaged them and sheep belonging to himself to plaintiff, an instruction in replevin therefor after the death of T., that plaintiff as mortgagee of T. succeeded to his rights of ownership and possession in the sheep on default in the conditions of the mortgage, and for the purpose of enforcing such rights plaintiff enjoys the same rights, both of ownership and possession, which T. had, while unobjectionable, if by it the court meant to, and did only, say that plaintiff succeeded to whatever ownership

33 Utah—14

T. had and to his right of possession arising from such ownership, might have been understood by the jury, when read in connection with the succeeding instruction, which, even if correct, had no proper place in the case, that any contract in relation to the running of sheep between T. and defendants in force at T.'s death would not be terminated by his death alone, but would remain in force, and its obligations would have to be performed by his executor or administrator, who also would receive the benefits thereof for the estate, to mean that, as T. was given the right of possession of the sheep under the leases or contracts between him and defendants, plaintiff, under its mortgage, also had such a right of possession, to which extent it was misleading and erroneous; T.'s right under his lease being personal to him and not assignable, without consent of the lessors.

4. CONFUSION OF GOODS—EFFECT—TENANCY IN COMMON. Where leased sheep are intermingled with the sheep of the lessee, and so incapable of identification, the lessors and lessee, as to the flock, become tenants in common.

5. TENANCY IN COMMON—MORTGAGES. A mortgage of sheep in which the mortgagor has an interest as tenant in common passes such interest.

6. SAME—ACTION BETWEEN CO-TENANTS—REPLEVIN. While the general rule against a tenant in common maintaining replevin against his co-tenant for his individual interest in the common property does not obtain where the property is alike in quality and value, and readily divisible by measurement or weight, and his part is wrongfully detained, and the action is necessary for maintenance of his rights, yet he must show the existence of all these conditions.

APPEAL from District Court, Seventh District; F. Erickson, Judge.

Action by the Manti City Savings Bank against Niels Peterson and others. Judgment for plaintiff. Defendants appeal.

REVERSED AND REMANDED FOR A NEW TRIAL.

*J. W. Cherry, E. Hansen,* and *Thurman, Wedgwood & Irvine* for appellants.

*W. D. Livingston and Willard Hanson* for respondent.

APPELLANT'S POINTS.

No rule is better settled than that one tenant in common cannot maintain replevin against his co-tenant for his individual interest in the property. This is for the reason that one party only has as much right to the possession of the common property as the other. (Shinn on Replevin, sec. 183 and authorities there cited: Cobbey on Replevin, sec. 292 *et seq; Bohlin v. Arthur*, 115 U. S. 482; *Hill v. Seager*, 3 Utah 379; *Balch v. Jones*, 61 Cal. 234; *Frans v. Young*, 24 Iowa 375; *Hoffer v. Agee et al.* [Colo.], 47 Pac. 973; *Sharp v. Johnson* [Oregon], 63 Pac. 485.)

RESPONDENT'S POINTS.

It is a rule well recognized that where the identity of specific property is lost by co-mingling with other property, that a recovery can be had in replevin from the mass of a quantity equal to the amount originally owned without identifying each particular item as the original property. (24 Am. & Eng. Ency. Law 482; *Aams v. Gorham*, 6 Cal. 68; *Piazzek v. White*, 23 Kans. 621; *Sutherland v. Carter*, 52 Mich. 471; *Grimes v. Cannell*, 23 Neb. 187; *Fines v. Bolin*, 36 Neb. 621; *Young v. Miles*, 20 Wis. 615; *Halpin v. Stone*, 78 Wis. 185; *Wilkins v. Stewart*, 85 Pa. 255; *Bert v. Hoxie*, 90 Wis. 623, 64 N. W. 426.

STRAUP, J.

This is an action of replevin. On December 5, 1902, one Peter Thompson gave a mortgage to the plaintiff on 1,600 head of stock sheep to secure the payment of a promissory note for $1,594.16 payable August 1, 1903. The note and mortgage evidenced a renewal of a loan theretofore made by plaintiff to Thompson. Peter Thompson was engaged in the business of running sheep and farming. He died August 2, 1903. No part of the note had been paid. The mortgage contains a provision giving the mortgagee the right to take possession of the sheep on default of payments or breach of the mortgage

covenants. The sheep described in the mortgage were "stock sheep marked with two upper bits in the left ear and an upper bit and under bit in the right, and branded with a 'T' wool brand on the back." On September 2d, the sheep then being in the possession of the defendants, the plaintiff demanded possession, which was refused. It then commenced this action, and the sheriff, under the order of seizure, took possession of 2,160 head of sheep marked as described in the mortgage, and delivered them to the plaintiff. The defendants, in their answer, denied plaintiff's ownership and right of possession, and alleged ownership and right of possession in themselves to 2,163 head of sheep, marked as described in the mortgage. The case was tried before the court and a jury. A verdict was rendered in favor of plaintiff. The defendants appeal.

The plaintiff gave evidence showing the execution and delivery of the note and mortgage, and nonpayment of the note; that Peter Thompson, at the time of his death, was in the possession of about 2,900 head of sheep; that about 2,163 head, including increase, were marked as described in the mortgage; a demand on, and a refusal by, the defendants to give possession; and that the plaintiff sold of the sheep so taken from the defendants and out of the herd, 2,141, head, in satisfaction of the mortgage. The defendants gave evidence that of the 2,900 head of sheep in the possession of Peter Thompson at the time of his death something over 2,000 head belonged to them, and which had been leased to him by them. With respect to the number owned by the defendant Fisher he testified that he first leased sheep to the deceased in 1897; that in 1901 he leased 387 head to him; and that the terms of the lease were evidenced by a writing signed and delivered by the deceased, as follows: "Ephraim, Utah, October 1st, 1901. This certifies that I have leased and received of C. J. Fisher of Ephraim, Utah, three hundred and eighty-seven head of stock sheep for one year, and agree to pay to said C. J. Fisher ten head of sheep increase on each one hundred, also one and one-half pounds of wool on each head for the lease and use of said sheep. Said 387 sheep, together with

the ten on each hundred increase when returned to said C. J. Fisher, to be an average of all the sheep in my herd, and to be received by him or delivered to him within thirty miles of Ephraim, Utah, on October 1st, 1902; said sheep to be separated from my herd in the presence of said C. J. Fisher or a representative duly authorized by him to receive them. [Signed] Peter Thompson." He further testified that the contract was renewed in the fall of 1902; that he had received the wool rentals, but not any sheep, from the deceased; that in the fall of 1903 he was entitled to and owned 468 head in the herd; that the deceased was to have the care and management of the sheep and pay the taxes on them, but that he was not to sell any of them without his permission; that the sheep and their increase were to be marked with Peter Thompson's mark (the same mark described in mortgage), and that the sheep were to be mixed with Thompson's sheep; and that the witness could not identify his sheep nor distinguish them from the rest of the herd.

The defendant Niels Thompson testified: That he leased sheep to the deceased commencing in 1896 on the same terms as testified to by defendant Fisher, but that his lease was verbal. Each year they had a settlement and determined the number of sheep belonging to him. In the fall of 1901 he had 832 head. In 1902 a settlement was had, and he had 915 head, and in 1903 he was entitled to and owned about 1,000 head.

The defendant Albert Thompson testified that he also leased sheep to the deceased commencing in 1896, upon terms similar to those of the other defendants; that at the end of each year a settlement was had; that in 1901 he leased 489.2 head, which was evidenced by a writing, signed and delivered to him by the deceased, as follows: "Ephraim, Utah, October 1, 1901. This certifies that I have 489.2 sheep on shares belonging to Albert Thompson, for which I agree to pay 1 1-2 pounds of wool and ten sheep increase per hundred, the sheep when delivered to be at or near Ephraim, Utah, and to be an average of my herd. [Signed] Peter Thompson." He further testified that in the fall of 1902 the contract was renewed.

The defendant Caroline Linberg testified that she leased sheep to the deceased under the following terms:

"Ephraim, Utah, July 6, 1897.

"This certifies that I have 21 head of sheep on shares belonging to Caroline Linberg and agree to pay $1\frac{1}{4}$ lbs. of wool per head and one increase on ten head. Received said sheep October 1, 1896, from Ezra Madsen.

"[Signed]                                    PETER THOMPSON.

"Sheep due October 1, 1898, 25.4 and to be kept one year for ten increase per hundred and $1\frac{1}{2}$ pounds of wool per head. Sheep due October 1, 1899.

"[Signed]                                    PETER THOMPSON.

"Sheep due October, 1900. 30.74 head, to be kept one year from October 1900, at above terms.

"[Signed]                                    PETER THOMPSON."

"Ephraim, July 1, 1902.

"Have 37.19 head of sheep in herd of Caroline Linberg. Due October 1, 1902, and if left in herd to be on above terms, one in ten increase and one and one-half pounds of wool.

"[Signed]                                    PETER THOMPSON."

The defendant Johnson testified that he leased sheep to the deceased commencing in 1896 on the same terms as those of the other defendants; that the contract was renewed each year; that in the fall of 1902 the deceased had 176 head of sheep, and in the fall of 1903, 193 head.

All of the defendants testified that they received the wool rentals but no sheep from the deceased; that the sheep leased by them were mingled with Peter Thompson's sheep, and were marked with his mark for convenience and identification. The defendants also introduced in evidence book entries made by the deceased, and accounts kept by him between the defendants and himself from 1896 to 1901. Among others were the following:

"Oct. 1, 1901. Albert Johnson. Sheep on shares: 160.9."

"Oct. 1, 1901. N. Thompson. Sheep on shares: 915."

"Oct. 1, 1901. Albert Thompson. Sheep on shares: 489.2."

"Oct. 1, 1901. C. J. Fisher. Sheep in herd: 320. John Linberg 27.95."

The defendants further testified that they had no knowledge or notice that the deceased had given a mortgage on the sheep.

The case was here on a former appeal upon substantially the same facts. 30 Utah 475, 86 Pac. 414, 116 Am. St. Rep. 862. On the first trial, which was before the court, all the evidence of the defendants as above set forth was stricken on the theory that, as the identical sheep leased by them to the deceased were not to be returned, and were not capable of identification, the transactions were to be regarded as sales, and not as bailments or as creating a tenancy in common, and that the title of the sheep passed to the deceased, and he therefore conveyed mortgage title to the plaintiff, who thereafter became entitled to the possession of them. In so ruling and in striking the evidence we held the court erred, for which, among other reasons, the judgment was reversed, and the cause remanded. On a retrial of the case, the court instructed the jury as follows: "The defendants assert title to the sheep in controversy in this action, and each of them claim to have delivered certain sheep to Peter Thompson before the execution of plaintiff's mortgage, upon the terms that Thompson was to run them and allow a certain percentage of increase and pay a certain amount of wool each year as rent, and return the original number, with the increase added, at the termination of the lease, and that for convenience the sheep were all to be marked with Peter Thompson's mark. You are instructed that if you find from the evidence that the defendants did deliver any sheep to Peter Thompson upon those terms, the title to any such sheep would remain in the defendants, unless you find from the evidence that the parties to the transaction intended the contract as a sale and not a lease. In order to determine the right of possession in this action you should determine the intention of the contracts, whether verbal or in writing, between the defendants and Peter Thompson, the mortgagor of the plaintiff. In so doing you may consider all the circumstances attending the making

of the same and the effect given to them by the parties thereto. If you find from the evidence that it was the intention of the parties to the respective contracts to pass the title to the sheep therein described to Peter Thompson, then such contracts are contracts of sale, and they give the ownership and also the right of possession of said sheep to Peter Thompson. If, on the other hand, you find that the intention of the parties was not to pass the title of said sheep to Peter Thompson, but that the delivery of the same to him, if there was ever such a delivery, was merely for the purpose of ranging and caring for the same, then such contracts are contracts of bailment, and do not give the right of ownership to Peter Thompson." By these instructions the court permitted the jury to determine whether the deceased and the defendants, by the terms of their contracts, intended to pass the title of the sheep to the deceased, or whether they intended them as mere contracts of bailment. It was in effect casting the duty on the jury to determine whether the contracts were contracts of sale or bailment. In this we think the court erred.

Upon this question the case of *Spragins v. White*, 108 N. C. 449, 13 S. E. 171, is very pertinent. There an action was brought to recover the price of shoes sold. The defendant testified that, after having a conversation with the plaintiff's representative, he "agreed to buy a bill of shoes upon his promise to have them in Aulander in two weeks. Without this promise I would not have taken the goods. I had a contract to fill within two weeks. Plaintiff sent me an invoice of the goods and shipped them." The trial court there charged the jury: "If you should believe that this agreement and bargain were made, then you must inquire and determine what was meant and understood by it by the parties making it. Did it mean that the plaintiffs were to insure at all events the delivery by the transportation company of the goods in two weeks, and that in failure of such delivery in two weeks the sale was to be void at the option of the defendant, and he might return the goods to plaintiffs? If so, plaintiffs are not entitled to recover. But if it meant that plaintiffs were to use all due diligence in forwarding the order, in packing and

shipping the goods by the common carrier, and plaintiffs did all these things, then plaintiffs are entitled to recover the bill and interest, as before stated." In reviewing the charge, the appellate court in quoting from *Young v. Jeffreys,* 20 N. C. 361, said:

"Where a contract is wholly in writing, and the intention of the framers is by law to be collected from the document itself, then the entire construction of the contract, that is, the ascertainment of the intention of the parties as well as the effect of that intention, is a pure question of law, and the whole office of the jury is to pass on the existence of the alleged written agreement. Where the contract is by parol, that, is, oral, the terms of the agreement are of course a matter of fact, and if those terms be obscure, or equivocal or are susceptible of explanation from extrinsic evidence it is for the jury to find also the meaning of the terms employed; but the effect of a parol agreement, when its terms are given and their meaning fixed, is as much a question of law as the construction of a written agreement."

It was there further stated that, if there be no dispute as to the terms of oral contracts, and they be precise and explicit, it is for the court to declare their effect, and in such case the rule is the same as if the contract were in writing. To the same effect is *Gassett v. Glazier,* 165 Mass. 473, 43 N. E. 193.

The terms of the contracts here were necessarily to be ascertained from the evidence. Some of the contracts were in writing. Others were oral. But in all the terms were precise and explicit; the language used, clear and unequivocal. There *was not anything doubtful or ambiguous about them which* required explanation by resorting to extraneous circumstances. It was the duty of the court to instruct the jury that, if they found the existence of the contracts as testified to by the defendants, the effect of such contracts did not constitute a sale of the sheep; that the title did not pass to the deceased (*Savings Bank v. Peterson,* 30 Utah 480, 86 Pac. 414, 116 Am. St. Rep. 862, and cases there cited); and that he, as against the defendants, could not, without their consent, give a binding mortgage upon the sheep which he had received and held under the terms disclosed by such contracts.

The court further charged the jury: "You are instructed that, as a general rule of law, Peter Thompson could not, by his mortgage, convey to the plaintiff a better title to the sheep in controversy than he himself may have had; or, in other words, no one without title can convey a title to any property and defeat the claim of the rightful owner. But under some circumstances the owner of property is estopped to assert his title to such property against an innocent purchaser or mortgagee for value, and in such circumstances the rights of innocent third parties do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the acts of the real owner, which preclude him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear vested in the party making the mortgage or other conveyance. In other words where one of two innocent persons suffers from the wrong of a third person, he must suffer by the wrong who puts it in the power of the wrongdoer to cause the loss." This charge should not have been given. Neither the pleadings nor the evidence raised a question of estoppel. It was not alleged, nor was it proven, that the defendants had knowledge of the execution of the mortgage, or that they misrepresented or concealed any fact with respect to their title or ownership, or that they induced the giving of the mortgage, or that the plaintiff in any particular was misled or deceived by any act or conduct on their part or by anything said or done by them. The giving of the instruction may well have led the jury to believe that there was evidence in the case upon which they were at liberty to find that the defendants were estopped from asserting their title or right of possession to the sheep.

The court also instructed the jury (No. 13) as follows: "You are instructed that the plaintiff herein, as mortgagee of Peter Thompson, succeeded to his rights of ownership and possession in the sheep in controversy upon default of the conditions of the mortgage under which the plaintiff claims its right of possession, and for the purpose of enforcing and defending such rights the plaintiff enjoys the same rights, both

of ownership and possession, which Peter Thompson had." And (13a) as follows: "I instruct you that any contracts in relation to the running of sheep between Peter Thompson and any of the defendants in force at the time of Peter Thompsons's death would not be terminated by reason of his death alone, but the same would remain in force and effect, and the obligations thereof would have to be performed by his executor or administrator, who also would receive the benefits of such contracts for and in behalf of said estate." If by instruction No. 13 the court meant to, and did only, say that the plaintiff succeeded to whatever ownership the deceased had, and to his right of possession arising from such ownership, the instruction would not be open to criticism. But when it is read in connection with 13a the jury might well have understood it to mean that, inasmuch as the deceased was given the right of possession of the sheep under the contracts or leases between him and the defendants, the plaintiff, under its mortgage, also had such a right of possession. To that extent the instruction was misleading and erroneous. The only right of possession which the plaintiff had was dependent upon its mortgage, and upon the title and ownership of the deceased. It was entitled to the possession of whatever sheep the deceased owned and was mortgaged to it by him. It was not, however, entitled to the possession of any sheep which the defendants had leased to him. Because the deceased was in possession of the defendant's sheep under the terms of the leases, the plaintiff, by virtue of its mortgage, did not succeed to such a right of possession. The leasing of the sheep by the defendants to the deceased was personal to him. His right thereunder was not assignable to a third party without the consent of the defendants. *Lewis* v. *Sheldon,* 103 Mich. 102, 61 N. W. 269; *Randall* v. *Chubb,* 46 Mich, 311, 9 N. W. 429, 41 Am. Rep. 165.) His right of possession, depending upon the leases, ended with his death. It was wholly unnecessary to inform the jury as to what rights possessed by the deceased would, or would not, be succeeded to by his executor or administrator, as was done in instruction No. 13a.

Furthermore, we very much doubt the correctness of the law as therein stated. While the administrator undoubtedly succeeded to whatever interest the deceased had in and to the sheep, yet it would seem the leasers, being personal with the deceased, and calling for his personal care and attention, ended with his death, and that the administrator would not be authorized, against the consent of the defendants, to step into the shoes of the deceased and run the sheep as he might have done had he lived. Edwin Booth's administrator might quite as well have claimed the right to play Hamlet under a part-performed contract of his intestate, or the executor of James Whistler to paint an unfinished painting of his testator. If the testimony of the defendants concerning the leases and the number of sheep leased by them to the deceased is believed and found to be true, then the deceased at the time of his death had in his possession something like 2,100 head of sheep—the exact number we do not undertake to say—belonging to the defendants. The remainder of the herd of 2,900 head of sheep belonged to the deceased. If the sheep which the defendants had leased were mixed with the sheep of the deceased so as to be incapable of identification, the deceased and the defendants, as to the herd, became tenants in common. Whatever interest the deceased as such tenant in common had in and to the herd the plaintiff succeeded to under its mortgage. Generally one tenant in common cannot maintain replevin against his co-tenant for his individual interest in the common property. Such undoubtedly is the rule where the common property consists of a specific chattel or a single piece of property, as was the case in *Hill* v. *Seager,* 3 Utah 379, 3 Pac. 545, or where the things in their nature are so far indivisible that the share of one is not susceptible of delivery without the whole. But it has been frequently held that the rule should not obtain in a case where the intermingled property is alike in quality and value and readily divisible by measurement or weight. It has been quite generally held that tenants in common, or persons who are separate owners of articles stored in mass, such as corn, wheat, coal, logs, etc., each article being of like nature and

quality with the others, may have replevin for his proportionate part of the intermixed chattels if the same is wrongfully detained and the action is necessary for the maintenance of his rights, subject to deductions for any loss or waste properly falling to his share while the property remained in mass. (20 Am. & Eng. Ency. Law, 493, and cases; Shinn on Replevin, sec. 183, and cases.)

If the testimony of the defendants is true, and the sheep were intermingled and incapable of identification, they and the plaintiff at the time of its demand were tenants in common, but before it was entitled to maintain the action it was necessary to show that the property was alike in quality and value; was easily divisible; that the defendants asserted ownership to the entire herd, or attempted to remove or convert the common property, or otherwise wrongfully held it antagonistic and hostile to the rights of the plaintiff, that they refused, on plaintiff's demand, to deliver; and that the action was necessary for the maintenance of plaintiff's rights. When such is shown it is entitled to the possession of whatever interest the deceased, as tenant in common, had in and to the herd at the time of his death. It is entitled to no more. It in no event was entitled to the possession of the interests which the defendants, or either of them, had in and to the herd.

The judgment of the court below is therefore reversed, and the cause remanded for new trial. Costs to appellants.

McCARTY, C. J., and FRICK, J., concur.