[Civil No. 2822.   Filed November 10, 1930.]

[292 Pac. 1020.]

J. A. HAGAN, STANDARD ACCIDENT INSURANCE COMPANY, a Corporation, and JOSEPH FINK, Appellants, v. GEORGE H. COSPER and MUSSETT COSPER, Appellees.

Messrs. Sloan, Holton, McKesson & Scott and Mr. T. E. Allyn, for Appellants.

Messrs. Ellinwood & Ross, Mr. John E. Sanders and Mr. James S. Casey, for Appellees.

LOCKWOOD, C. J.—J. A. Hagan brought suit in the superior court of Greenlee county to recover certain cattle then in the possession of George H. and Mussett Cosper, and under a writ of replevin issued in the case obtained possession of 753 head of cattle. The Cospers answered, setting up ownership of the cattle in George H. Cosper, and prayed for an alternative judgment against Hagan under the statute. Later, Joseph Fink, claiming an interest in the cattle under a contract of purchase made with Hagan, was permitted to intervene in the case, alleg-

ing ownership in Hagan, subject to Fink's contract of purchase. The case was tried to the court without a jury, and findings of fact and conclusions of law thereon filed, upon which the court returned judgment in favor of defendant George H. Cosper in the sum of nearly $46,000. A motion for a new trial was made, and in the course of the argument thereon a remitter was filed by Cosper in the sum of $3,360, whereupon the motion for new trial was overruled and the case was appealed by Hagan, Fink and Standard Accident Insurance Company, the surety on the replevin bond.

There are some sixteen assignments of error, which appellants sum up under two headings: First, an alleged failure of the trial court to determine the ownership of the replevied cattle in accordance with the proved and admitted facts; and, second, a failure to render judgment in accordance with such determination. We are, of course, bound by all the findings of fact of the trial court necessary to support the judgment, whether such findings be direct or implied, if there be any evidence in the record sufficient to sustain them. *First Baptist Church* v. *Connor,* 30 Ariz. 234, 245 Pac. 932; *Welker & Clifford* v. *Merrill,* 32 Ariz. 90, 255 Pac. 991. There is but little dispute in the evidence, and we are satisfied all the direct findings of the trial court are sustained thereby, and that in addition thereto there are certain other findings necessarily implied from such evidence and the judgment, but not specifically mentioned by the court. The facts of the case, based on these findings, express and implied, are as follows:

More than forty years ago one J. H. T. Cosper, commonly called Toles Cosper, began to run cattle on the Blue River Range in Greenlee county, Arizona. The first brand he used consisted of a quarter circle under the eye, commonly called a "U." About 1888,

for some reason he began using a brand consisting of two capital letters Y, on the left side, separated by a bar, continuing such use until about the year 1916. At that time another party began to use a brand in the same locality described as X X X, and Cosper, in order to prevent any possible conflict with the last-named brand, directed his employees in the future to brand all new cattle with the U under the eye in addition to the Y—Y· on the side. In 1919 the Live Stock Sanitary Board required that all brands in use be re-recorded, and Cosper made application to the board for a brand consisting of a quarter circle, or U, under the eye and a Y—Y on the side, which brand was duly recorded. From that time on the entire natural increase of the Cosper herd, no matter what the brand of the mothers, was branded U Y—Y, and the further use of the Y—Y brand was discontinued, except that the cattle already in that brand were not rebranded.

About 1916 defendants George and Mussett Cosper, being nephews of Toles Cosper, drove certain cattle of theirs from a range in New Mexico to the range of Toles Cosper, and a few years thereafter sold all of said cattle to the latter, there being between seven and eight hundred head, and took his note therefor. In 1920 Toles Cosper became financially embarrassed, and on the seventh day of March, 1921, gave a chattel mortgage covering 225 head of cows described as branded Y—Y to one Grace Morrison. On June 6th of the same year he gave a chattel mortgage covering 350 head of heifers and cows, also described as branded Y—Y, to Phelps Dodge Mercantile Company, and on August 10th a mortgage covering 300 cows branded Y—Y and their increase to Julia Pitt. These mortgages secured loans for about $8,000.

On November 25th, 1922, W. F. Hagan, the predecessor in interest of plaintiff, brought suit against

Toles Cosper, and by range levy attached all horned, female cattle branded Y—Y, and all bulls in the same brand. This suit ripened into a judgment, and a range sale was made of all the attached property in June, 1923, to W. F. Hagan, who went into possession of the entire Cosper herd, maintaining and operating them without segregation as his own till August, 1924. On January 4th, 1924, George Cosper, defendant herein, sued Toles Cosper on the note above referred to, and attached by range levy all horned cattle branded U Y—Y, which suit ripened into judgment and a range sale of the attached cattle in August, 1925, to George Cosper. On January 25th, 1924, W. F. Hagan sued Toles Cosper, attaching by range levy all Y—Y and also U Y—Y cattle, together with the U Y—Y brand, which suit ripened into judgment and a range sale to W. F. Hagan of the said attached cattle and brand.

In August, 1924, an action was brought by Julia Pitt to foreclose the mortgage mentioned above, and the Hagans, the Cospers, and the holders of the other mortgages were all made parties thereto. At this time the Arizona Copper Company, Phelps Dodge Mercantile Company and George H. Cosper were the owners of the other mortgages. The defendants answered and the other mortgagees cross-complained, asking for foreclosure of their mortgages. Judgment was rendered foreclosing all the mortgages, and the title given by the foreclosure sale, whatever it may prove to be ultimately, passed to George H. Cosper. The trial court in that suit expressly found that at the time of the foreclosure there were only about five hundred head of cows branded Y—Y in existence, but made no finding as to when such brand was placed on any particular cattle. By its terms the rights of the purchasers were confined to female cattle branded Y—Y, and existing at the time of

the execution of said mortgages, together with the increase on the cattle covered by the Pitt mortgage, and the judgment and order of sale specifically excluded therefrom all cattle branded U Y—Y.

When the suit to foreclose the Pitt mortgage was started, a receiver was appointed to take possession of the cattle, and during his receivership he sold some six hundred head from the herd, selecting them indiscriminately, regardless of their brand. The receiver was discharged in February, 1925, and by agreement Everet Hagan, acting for W. F. Hagan, and George Cosper took joint possession of the cattle for some four months, when the latter took exclusive possession of the entire herd, representing the mortgagees as to the Y—Y cattle, and himself as to the U Y—Y cattle, and continued in possession and control of the herd until this replevin suit was commenced, making no segregation thereof. In the meantime he moved them to another range, and J. A. Hagan became the owner of all of W. F. Hagan's interest therein.

There are some other facts found by the trial court, or implied by the judgment, which are not needed for a general understanding of the situation, but if necessary we will refer to them from time to time as occasion requires.

The first question for us to determine is whether the U Y—Y and the Y—Y brands are the same in the eyes of the law. Counsel for Hagan argued most strenuously in the course of the hearing that the brands were legally one and the same, and were so understood and considered by all the parties hereto. We are of the opinion, however, that on the findings of the court and the evidence, this position is unsound. According to the testimony of Toles Cosper, he used the legally recorded Y—Y brand for his entire herd of cattle up to a certain time, and

then added the U because the Y—Y brand might conflict with one being used by other parties. In 1919 he recorded the U Y—Y brand and failed to re-record the Y—Y, ceasing its use. A brand is identified as a whole, and not by the separate characters therein. There are hundreds of brands in this state which agree in one or perhaps two characters, but no one would contend for a moment that this partial similarity made them the same brands legally. In the eyes of the law a U Y—Y brand could no more be the same as Y—Y than a brand A B C could be the same as a brand A B X.

The confusion has evidently grown out of the fact that the owner of the cattle branded in both brands happened to be the same person, and that he ran all the cattle indiscriminately on the same range. This, however, does not in any manner affect the separate legal identity of the brands and their effect on the title of the cattle which bore them. Much is made by counsel for plaintiff of the finding of the trial court that all the Toles Cosper cattle, regardless of their brands, were commonly spoken of as the Y—Y herd. This is obviously due to the fact that it is the custom among cattlemen in referring to the cattle owned by a certain person to call them by the name of the brand in which most of the cattle are, rather than by the name of the owner. Sometimes a cattleman has one major and several minor brands, but in colloquial usage the entire herd is generally referred to, not as the "John Jones cattle," but by the name of the principal brand. This custom, however, can in no manner affect the legal identity of the cattle branded in brands which are different under the law. When any legal document or process conveys cattle by description of the brand its effect is limited, except perhaps as between the parties to the conveyance, to the particular brand described therein,

and when the right of a third party is concerned, parol evidence certainly is not admissible to show that two brands, legally different on their face, were popularly considered one and the same.

The next question is as to what was necessary to pass title under the various suits and sales hereinbefore referred to. It is ordinarily necessary, in order that a levy on personal property be valid, that the levying officer take actual possession and control of the property. It is also generally required that such property should be present at the time and place of the sale, and subject to inspection by all persons who may desire to purchase. The reason for these rules is too obvious to require a restatement. Experience shows us, however, that to enforce them literally as to all classes of personal property will sometimes work a greater injury to the parties to the proceedings than will their nonenforcement. Realizing this, many legislatures have made special exceptions to the general rule, and among the states so doing is Arizona.

Our Code provides that a levy upon horned cattle running on the open range may be made in a certain manner without actually taking possession of the cattle, and, further, that they need not even be present at the sale, but adds: ''The purchaser at such sale may take such property or gather and pen such stock and select therefrom the number purchased by him.'' Paragraph 4222, Rev. Code Ariz. 1928. And the certificate of sale made by the officer conveys to the purchaser all the right which the debtor had in such property on the day the levy was made. Our statutes on this subject are very similar to and have evidently been taken from those of the state of Texas, and that state has construed the effect of a range levy and sale in the case of *Gunter et al.* v. *Cobb*, 82 Tex. 598, 17 S. W. 848, 850. After discussing the

general rules applying to execution on personal property and the exceptions laid down by the legislature of Texas in regard to range stock, the court says, referring to a levy made on a portion of a herd of cattle carrying a certain brand:

"It is evident from the statute that the act of sale does not pass title to any particular animals, but gives only the right to select the number sold; and until this is done the purchaser's title does not attach to any animals."

We think this statement applies with equal force to a levy made on range stock under our statute, so long as the animals levied upon are merely a portion of a similarly described general mass. Before any title passes by reason of a sale of such stock under execution, the purchaser must gather and select from the general mass the specific animals to which he claims title under the certificate of sale. If, however, the animals described by the certificate comprise the entire class so described, the necessity of the rule fails, and there being nothing to segregate, a segregation is not required, and the title passes immediately on the delivery of the certificate of sale, without the need of a gathering and selection of the stock.

The third question is as to the law when various animals bearing the same brand are commingled so that it is impossible to determine the ownership of each individual animal. The general rule is well settled. The party who is responsible for such commingling and whose duty it was to keep the animals separate must bear the loss. *Ayre* v. *Hixson,* 53 Or. 19, 133 Am. St. Rep. 819, Ann. Cas. 1913E 659, 98 Pac. 515; *Tootle* v. *Buckingham,* 190 Mo. 183, 88 S. W. 619; *Mahoney* v. *Citizens' Nat. Bank of Salmon,* 47 Idaho 24, 271 Pac. 935. And the one who is responsible for commingling cannot maintain replevin,

even though the live stock has been intermingled through unavoidable accident or mistake. *Manti City Sav. Bank* v. *Peterson,* 33 Utah 209, 126 Am. St. Rep. 817, 93 Pac. 566; *Hobbs* v. *Monarch Refrigerating Co.,* 277 Ill. 326, Ann. Cas. 1918A 743, L. R. A. 1917D 847, 115 N. E. 534; *Moseley* v. *Cheatham,* 62 Ark. 133, 34 S. W. 543; *McDonald* v. *Bailey,* 25 Okl. 849, 37 L. R. A. (N. S.) 267, 107 Pac. 523. With these general principles of law to guide us, let us consider the particular facts of the case, and endeavor, if possible, to trace the title to the various cattle in question.

On November 25th, 1922, the title and possession of the entire herd was admittedly in Toles Cosper. The herd consisted of (a) certain cattle, all branded *before* the late fall of 1919, with Y—Y, and (b) certain others branded from 1916 on with U Y—Y. Eight hundred seventy-five of the cows branded Y—Y were subject to various mortgages, as were the increase of an unsegregated three hundred of such cows, but no segregation whatever had been made by anyone to that time. On November 25th, 1922, W. F. Hagan instituted his first suit and attachment No. 846 B. This covered "all female Y—Y cattle and bulls." The suit was carried to judgment and a sale made thereunder of "all horned female cattle branded thus: Y—Y, . . . " together with the bulls. Hagan, by the findings of the court, took range possession of the cattle sold, but never penned and selected them. Under the rules above set forth, since the sale covered *all* female cattle branded Y—Y, we are of the opinion no penning and selection were required, and title to such cattle vested in Hagan by reason of the certificate of sale, the title, of course, dating back to the day of the levy, November 25th, 1922, and being subject to the mortgages above described. There remained in Toles Cosper at that time title to the Y—Y steers and all U Y—Y cattle which were not the increase

of Y—Y cattle after November 25th, 1922. Since the title to the female Y—Y cattle in Hagan dated back to November 25th, 1922, he was obviously also the owner of their increase after that date, subject to the mortgage liens above described.

On January 4th, 1924, George Cosper filed suit and attachment No. 864 B against Toles Cosper. This levy covered all horned cattle branded in the U Y—Y brand. The suit was prosecuted to judgment and a sale was made by virtue thereof of all U Y—Y horned cattle, George Cosper being the purchaser thereof. He went into range possession of the animals, but made no attempt to pen and select therefrom. Whether selection and segregation was necessary under the rules above laid down depends first upon the question of whether the sale covered *all* cattle in the U Y—Y brand, and, second, if it did not, whether there was a commingling, and, if so, who was responsible therefor.

As we have indicated, the increase of the female Y—Y cattle from November 25th, 1922, passed to Hagan by reason of his attachment and sale, subject only to the terms of the mortgages. It is not apparent from the record how such increase was branded, if at all, up to August, 1924, when the receiver in the mortgage foreclosure sale took possession of the entire herd, and, as was ordered by the court, branded all the increase U Y—Y. It appears, however, from the findings, that the possession of the entire herd was in Hagan from November 25th, 1922, until possession thereof passed to the receiver. Under such circumstances we are of the opinion that it was the duty of Hagan, who was in possession of the cattle, to see that the increase belonging to him was kept separate from that belonging to Toles Cosper, and that if there was any commingling of the U Y—Y cattle by reason of the

fact that the increase of the Y—Y cattle owned by him were mingled with the U Y—Y cattle owned by Toles Cosper to January 4th, 1924, and by George Cosper thereafter, under the rule of law above set forth he must bear the burden of the loss, if any. We hold, therefore, that George Cosper, by virtue of his attachment of January 4th, 1924, with the succeeding judgment and sale, under the law regarding the commingling of cattle above stated was in August, 1924, as against Hagan, the owner of and entitled to the possession of all cattle then branded U Y—Y, regardless of whether or not they were the increase of the female Y—Y cattle belonging to Hagan, or the U Y—Y cattle belonging to Toles Cosper at the date of the attachment.

On January 24th, 1924, Hagan filed suit and attachment No. 973 B, intended to cover all U Y—Y and Y—Y cattle. So far as the U Y—Y cattle were concerned, this was obviously of no effect, for Toles Cosper at that time had no attachable interest whatever to any U Y—Y cattle. The suit was prosecuted to judgment and sale, and its effect was to transfer to Hagan the title to any steers in the Y—Y brand as of January 24th, 1924.

In August, 1924, foreclosure of the Pitt mortgage was begun in suit No. 1017 B, and eventually by cross-complaint all three of the mortgages above described were foreclosed in such suit, and the property covered thereby ordered sold. The sale was expressly limited to 875 female cattle, standing in the Y—Y brand, as of the date of the mortgages, and the court further found that at that time there were only about 500 cows bearing that brand in existence. Since under the implied findings of fact no cattle were branded Y—Y after 1919, and the brand was void for use after that date, we must assume, in the absence of proof to the contrary, that all cows branded

Y—Y were so branded before 1921 and were subject to the various mortgages. All rights to such cows and their future increase necessarily then passed by reason of the sale under the various mortgages to George Cosper. Thereafter the title to the remainder of the original Toles Cosper herd stood as follows: George Cosper owned all of the Y—Y cows and their increase after the mortgage foreclosure by virtue of the fact that no cattle had been branded Y—Y after the fall of 1919, and there were but 500 cows in that brand in existence when the mortgages were foreclosed. He owned all the U Y—Y cattle existing in August, 1924, and their increase by reason (a) of his attachment of January 4th, 1924, and (b) that Hagan, after his attachment and taking possession of the herd in suit No. 846 B, was responsible for any commingling of the increase of Y—Y cattle with U Y—Y cattle to that date. Hagan had title to the steers and bulls, if any, branded Y—Y and any increase of the Y—Y cows from August, 1924, to November, 1926, since either the receiver or George Cosper was responsible for any commingling between those dates, they being in possession of the Y—Y cows during that period.

At the time, therefore, of the commencement of this replevin suit, George Cosper was the owner of and entitled to the possession of the entire remainder of the Toles Cosper herd, except any bulls or steers branded Y—Y, and the increase of the Y—Y cows from August, 1924, to November, 1926. The findings of the trial court do not state specifically the character and brands of the individual members of the herd taken by the writ of replevin, nor has our attention been called to any evidence in the record on that point by the briefs.

It is the rule that plaintiff in replevin must recover on the strength of his own title, or right of posses-

sion, and not on the weakness of his adversary. *Hall* v. *Southern Pacific Co.*, 6 Ariz. 378, 57 Pac. 617; 23 R. C. L. 935; 34 Cyc. 1501, and cases cited.

There being no evidence that any animals owned by Hagan were included in the replevied property, the court rightfully rendered judgment for defendants. No complaint is made as to the amount of the judgment, and it is therefore affirmed.

McALISTER and ROSS, JJ., concur.