## MIDDLETON v. EVANS et al.

No. 5547. Decided May 28, 1935. (45 P. [2d] 570.)

*Bowen & Quinney,* of Salt Lake City, for appellant.

*Nephi Jenson,* of Salt Lake City, for respondent.

WADE, District Judge.

In this action, on September 1, 1928, the plaintiff Middleton obtained a judgment against the defendant Evans for $918.59.

Evans is the author of a book entitled "Joseph Smith, An American Prophet," which was published by the interpleaded defendant, MacMillan Company, pursuant to a written agreement dated November 25, 1932, between the author and publisher, which provided as follows:

"The author agrees to purchase from the company, on publication, 1,000 copies of said work, at the retail price, which retail price is estimated at $4.00, less a discount of 40%, and to pay for the same

within two months after publication of such work. These copies purchased at this special rate shall be free of royalty and may not be re-sold to the book trade, excepting the Mormon Church book stores at Salt Lake City, Utah, and other Mormon Church centers."

While the book was being published, Evans called on the garnishee, the Deseret Book Company, which is known as a Mormon Church book store, at Salt Lake City, and stated that his book was being published, that he was required to dispose of 1,000 copies thereof, and received a promise that it would give him an order when the book was published. Thereafter the representative of MacMillan Company called on the Deseret Book Company and asked for an order for said book, and was told that the book company had promised its order to Evans; whereupon the representative of Mac-Millan Company said that it was all right for it to order said book from Evans to the extent of 1,000 copies, and also stated the price to be $4, less 40 per cent.

About March 20, 1933, after the book had been published, Evans again solicited the Deseret Book Company to purchase certain copies of said book, and received from it an oral order for 300 copies, 250 copies to be sent by freight and 50 copies by express. Nothing was said at any time between the Deseret Book Company and Evans regarding the price which the book company was to pay for the books or by whom the books were to be delivered, or to whom payment was to be made. The Deseret Book Company, however, knew the price it would have to pay for the books, having been told by MacMillan Company's agent. Evans was not the agent at any time of MacMillan Company to sell said book or solicit orders therefor, nor was he ever authorized to represent MacMillan Company in the sale of said book or in the making or soliciting of orders therefor. His only dealings with said company in that regard were covered by their written contract.

Evans immediately communicated this oral order which he received from the Deseret Book Company to MacMillan Company, which company, on March 27, 1933, shipped the

said books as ordered directly to the Deseret Book Company, according to Evans' directions. On April 5, 1933, the Deseret Book Company handed to Evans a written confirmation of its oral order for said books, as is its custom to do where oral orders are given, which Evans sent on to MacMillan Company. On April 12, 1933, the Deseret Book Company received these books from MacMillan Company, and these 300 copies constituted a part of the 1,000 copies which Evans agreed to purchase under his contract with MacMillan Company.

On April 14, 1933, Middleton caused a writ of garnishment on his judgment against Evans in this case to issue and to be served on the Deseret Book Company, garnishee, which, on April 21, 1933, in answer to the question in regard to its indebtedness to the defendant, said:

"Have received 300 books, 'Joseph Smith' by Evans, from MacMillan Company. Amount and due date not known."

No invoice accompanied the shipment of books to the Deseret Book Company, and MacMillan Company made none to the Deseret Book Company until May 5, 1933, when it made and sent to the Deseret Book Company its invoice, billing it for the 300 copies of said book, at $4, less 40 per cent per copy, allowing two months from date of shipment for payment, which was not the usual practice. The invoice was received by the Deseret Book Company on May 12, 1933.

Thereafter MacMillan Company was interpleaded, and filed an answer, in which it alleges that the said books were shipped to the garnishee and sold on its credit and billed to it and charged to it on the books of the interpleaded defendant, and that the garnishee has accepted the same on said billing and agreed to pay the interpleaded defendant therefor. And the Deseret Book Company filed an amended answer to the same effect—all of which was denied by the plaintiff.

It appears that the attorney for MacMillan Company had been acting as the attorney for the defendant for a number

of years, and that the amended answer of the Deseret Book Company was prepared by said attorney, and that the defendant and the garnishee worked in harmony with the interpleaded defendant throughout this case.

The court found in favor of the interpleaded defendant and awarded the money to it, from which judgment the plaintiff appeals, and assigns as error that the judgment is not supported by the facts found, that certain of the findings of fact are not supported by the evidence, and that the court failed to make findings of fact on certain material issues in the case. Except as to certain particulars hereinafter discussed, and that this statement is more in detail, the court found the facts substantially as herein stated.

Plaintiff contends that Evans in his contract with MacMillan Company agreed to purchase 1,000 copies of his book from it, and that pursuant to said contract he solicited and sold to the Deseret Book Company 300 copies thereof, and ordered the MacMillan Company to deliver the same direct to the Deseret Book Company. In other words, Evans purchased, according to his contract, 300 copies from MacMillan Company and resold them to the Deseret Book Company, and, having bought the books from Evans, the Deseret Book Company is indebted to him for the purchase price thereof. On the other hand, MacMillan Company contends that it sold the books directly to the Deseret Book Company, and that therefore the Deseret Book Company is indebted to it for the purchase price thereof.

We will first determine the intent of the parties as expressed by the provisions of the contract, dated November 25, 1932, between Evans and MacMillan Company as hereinabove set out. Counsel for MacMillan Company contends that the real meaning of the contract is "simply this,—that Evans was obligated to 'dispose of' or induce some 'Mormon Book Store' to take 1,000 copies without any profit or royalty to Evans." It is a well-established rule of law that where the language of a contract is clear and unambiguous, it is the duty of the court to

determine the intent of the parties from the language used by the parties in the contract. *Wintle* v. *Utah-Idaho Sugar Company*, 73 Utah 215, 273 P. 312; *Armstrong* v. *Larson*, 55 Utah 347, 186 P. 97; *Manti City Sav. Bank* v. *Peterson*, 33 Utah 209, 93 P. 566, 126 Am. St. Rep. 817. The language of this contract is absolutely clear and unambiguous and is capable of only one interpretation, which is, that Evans agreed to purchase from MacMillan Company, on publication, 1,000 copies of his book, at the retail price less 40 per cent, and to pay for the same within two months and not to resell them to the book trade excepting to Mormon Church book stores.

Under section 81-1-1 (all sections herein referred to are R. S. Utah 1933), a contract to sell goods is defined as "a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price," and a sale of goods as, "an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." The only difference between the two is that in a contract to sell, the parties agree to transfer the property in the goods at some future time, whereas in the sale the parties agree to transfer the property presently. Section 81-1-5 provides that such goods may be "goods to be manufactured or acquired by the seller after the making of the contract to sell, in this title called 'future goods.'" This contract between MacMillan Company and Evans is clearly a contract to sell "future goods" by MacMillan Company to Evans, as the books were not yet manufactured at the time of the making of the contract.

Thereafter, pursuant to this contract, MacMillan Company published the book, and it thereupon became Evans' duty under his contract, to purchase 1,000 copies thereof. What was necessary for Evans to do in order to transfer the property in those books to him? Under section 81-2-1, "no property in the goods is transferred to the buyer unless and until the goods are ascertained." And section 81-2-2

provides that under a contract to sell, the property in the goods "is transferred to the buyer at such time as the parties to the contract intend it to be transferred," and "for the purpose of ascertaining the intention of the parties regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

And section 81-2-3 lays down the following rules for ascertaining this intention.

"Rule (2) Where there is a contract to sell specific goods, and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until such thing is done. * * *

"Rule (4) (a) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. * * *

"(b) Where in pursuance of a contract to sell the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not) for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally appropriated the goods to the contract.* * *"

Under these rules, in order to transfer the property in the 1,000 copies to Evans it would be necessary to first ascertain these books, and then the transfer would depend entirely on the intent of the parties, this intent to be ascertained from the terms of the contract and the circumstances of the case, and before the property can pass the goods must be put in a deliverable state. After that, all that is necessary is that the goods described in the contract be unconditionally appropriated to the contract, and such an appropriation is presumed to have happened when the seller delivers the goods to the buyer, or to a carrier or other bailee for the purpose of transmission to or holding for the buyer. In compliance with this contract, MacMillan Company manufactured the books, thus ascertaining and putting them in a

deliverable state. Then on the order of Evans and without any communication from the Deseret Book Company whatsoever in this regard, MacMillan Company delivered these books to the carrier, consigned to the Deseret Book Company. This would seem to be sufficient to comply in every detail with the requirements of an unconditional appropriation of these goods to this contract.

If there is any question about the delivery in this case to the carrier being sufficient to constitute an unconditional appropriation to this contract, it will be settled by the fact that it is a well-established rule that delivery to a person appointed by the buyer to receive the goods or to any third person at the buyer's request or with his consent is sufficient delivery to the buyer. See 55 C. J. p. 364, § 357, note 75; also, *Francis* v. *Merkley*, 59 Cal. App. 196, 210 P. 437; *Fergus County Hardware Co.* v. *Crowley*, 57 Mont. 340, 188 P. 374; *Williamsburgh Stopper Co.* v. *Bickart*, 104 Conn. 674, 134 A. 233. In the last case it is held that delivery to the buyer's customers in accordance with his instructions is delivery to him.

MacMillan Company's counsel contends that, regardless of the terms of the contract, Evans and MacMillan Company might have arranged so that Evans would only have to find a purchaser for these 1,000 copies of this book who would buy them directly from MacMillan Company. The evidence is clear that there was no express agreement to this effect, but counsel contends that the following facts show that that was what actually happened: That Evans did not stipulate the amount of the purchase price, or the terms of payment thereof or who was to pay the freight; that he never presented a bill or demanded payment for the books and was never given credit for them on the books of the Deseret Book Company, but that these books were credited to MacMillan Book Company on the books of the Deseret Book Company, and MacMillan Company billed the Deseret Book Company for these books. This is answered

by the fact that at the time of ordering these books the price was understood between the Deseret Book Company and Evans and there was no need to discuss it, and the fact that MacMillan Company only sent its invoice to the Deseret Book Company about a month after the books were shipped and the garnishment had been served, and that no one had been credited with these books by the Deseret Book Company prior to receiving this invoice, and that at the time of receiving this invoice Evans, MacMillan Company, and the Deseret Book Company were following the suggestions of one attorney in harmony to defeat the claim of the plaintiff. Counsel also contends that the fact that a written confirmation order was made by the Deseret Book Company and given to Evans and by him sent to MacMillan Company shows a sale by MacMillan Company direct to the Deseret Book Company. It was explained in the evidence that it was the custom of the Deseret Book Company to give a written confirmation order where the original order was oral, and since it was given to Evans it is not inconsistent with plaintiff's theory of the case. And it is further contended that the fact that the books were shipped by MacMillan Company directly· to the Deseret Book Company indicates a direct sale by MacMillan Company to the Deseret Book Company. Under the circumstances of this case this fact is not inconsistent with plaintiff's theory.

On the other hand, the following facts show a sale by Macmillan to Evans and a resale by him to the Deseret Book Company and are inconsistent with a sale by MacMillan Company directly to the Deseret Book Company: A sale, according to our statute above referred to, is an agreement whereby the seller transfers the property in the goods to the buyer. Clearly there was no such agreement between MacMillan Company and the Deseret Book Company in regard to these books, as there were no negotiations between them regarding these books until MacMillan Company sent the invoice a month after the books were received by the Deseret Book Company, and Evans, not being MacMillan

Company's agent, could not negotiate such an agreement for it. And under the circumstance of this case it is hard to see how such an agreement could be implied. On the other hand, there was a written contract between MacMillan Company and Evans whereby Evans agreed to purchase 1,000 copies of this book upon publication thereof, which he agreed not to resell to the book trade except to Mormon Church book stores. After the book is published, Evans goes to the Deseret Book Company, a Mormon Church book store to which he may resell his copies, and solicits an order therefor. He was not the agent of MacMillan Company, and his only connection with it was under the terms of the contract. Why did he solicit this order unless it was for the purpose of reselling a part of the 1,000 copies he had agreed to purchase from MacMillan Company? Evans received an order for 300 copies of his book from the Deseret Book Company, which he sends to MacMillan Company, and MacMillan Company ships these books to the Deseret Book Company without sending any bill or invoice until about a month after the goods were received by the Deseret Book Company and the garnishment had been served, which could only indicate that MacMillan Company was looking to Evans for the purchase price of the books until after his money was garnisheed. The Deseret Book Company in answer to the garnishment, regarding its indebtedness to Evans, answered:

"Have received 300 books 'Joseph Smith' by Evans, from MacMillan Company. Amount and due date not known."

This answer clearly indicated that the Deseret Book Company considered that it was indebted to Evans for those books; otherwise it would not have mentioned this transaction at all, it being only asked as to its indebtedness to Evans.

But counsel argues that the Deseret Book Company is liable or indebted for these boks to whoever was the owner of them immediately prior to the delivery to the Deseret Book Company. That is true, but if the above analysis is

correct, then when MacMillan Company delivered the books to the carrier the title passed to Evans and he became the owner of them, and when he delivered the books to the Deseret Book Company the title passed from him to the Deseret Book Company; so that immediately prior to the delivery to the Deseret Book Company the title was in Evans. It might be that the delivery of the books to the carrier by MacMillan Company would be sufficient to pass the property in the books from MacMillan Company to Evans and at the same time from Evans to the Deseret Book Company, even before they were actually delivered physically to it; but, in any event, if we are correct in holding that there was a sale to Evans and a resale by him to the Deseret Book Company, then even though one act transferred title it would pass first from MacMillan Company to Evans and through him to the Book Company. And the Deseret Book Company was indebted to Evans for the purchase price of the books at the time of the service of this garnishment upon it, and the plaintiff was entitled to a judgment to that effect.

The plaintiff first assigns that the "court erred in finding that at no time was anything respecting the price of said books mentioned between the Deseret Book Company and Evans." There is evidence to that effect; ∎ but it appears that it was explained in the evidence that the Deseret Book Company knew what the price would be. This seems to be a failure to find on a material issue, rather than a finding not supported by the evidence. In any event, the difference is not material, and if there was error it was harmless.

It is next assigned that the court erred in finding that it was within the contemplation of the Deseret Book Company and Evans that the purchase price of said books was to be paid directly to MacMillan Company by the Deseret Book Company. From a careful search of the record, there appears to be nothing in the evidence which supports this

finding. In fact, the first answer of the Deseret Book Company seems to indicate that it at that time contemplated paying this money to Evans; otherwise it would have expressed a doubt as to whether it owed the money to Evans or to the MacMillan Company. There being no evidence to that effect, the court erred in making such finding.

The plaintiff's third and fourth assignments of error are that the court erred in failing to find on issues made by the answer of the interpleaded defendant, as follows: That the said books were shipped to the said garnishee, upon the order of the garnishee, and sold on the credit of the garnishee, and billed to the garnishee, and charged to the garnishee on the books of the interpleaded defendant; and that the court erred in failing to find that the Deseret Book Company gave no orders or directions to MacMillan Company respecting the copies of said book ordered by it and in failing to find that the Deseret Book Company did not deal with or negotiate with the MacMillan Company respecting the purchase, delivery, or payment for the said books.

The undisputed evidence in this case shows that the Deseret Book Company ordered the books from Evans, that Evans sent this order to MacMillan Company, and that MacMillan Company sent the books directly to the Deseret Book Company, and that the Deseret Book Company gave no orders or directions to MacMillan Company and did not deal or negotiate with MacMillan Company respecting the purchase, delivery of, or payment for said books until long after the garnishment was served. The court failed to find that Evans sent the order given him by the Deseret Book Company to MacMillan Company and that the Deseret Book Company gave no orders or directions to MacMillan Company and did not deal or negotiate with MacMillan Company respecting the purchase, delivery of, or payment for said books. This being a material issue in the case, the court erred in failing to make findings thereon. Thus the case will have to be remanded to the district court for a new trial.

This case is therefore remanded to the district court for a new trial, plaintiff to recover his costs from the interpleaded defendant MacMillan Company.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

WOLFE, J., being disqualified, did not participate herein.