## UNION PORTLAND CEMENT CO. v.
## STATE TAX COMMISSION.

No. 6884.    Decided June 12, 1946.    (170 P. 2d 164.)

See 37 C. J., Licenses, sec. 90.

For opinion on rehearing see 110 Utah 152, 176 P. 2d 879.
*Judd, Ray, Quinney & Nebeker,* of Salt Lake City, for plaintiff.

*Wayne Christofferson* and *Clarence E. Neslen,* both of Salt Lake City, for defendant.

WOLFE, Justice.

Certiorari to review the action of the Tax Commission in making a deficiency use tax assessment against plaintiff for its use of coal, iron grinding balls, firebrick and various other items in its business.

Plaintiff is a corporation engaged in the manufacture of cement at Devil's Slide, Utah. On August 18, 1945, after due notice and hearing, the Tax Commission found that sales of all the items involved were made outside of the state of Utah and that the use of all the items was subject to the use tax. It thereupon ordered the plaintiff to pay a deficiency use tax for the period of March 1, 1941 to February 28, 1945 in the sum of $7,262.46, including interest at 6% per annum as of June 2, 1945.

Plaintiff objects to the assessment on its use of coal, iron grinding balls and firebrick. To the assessment of the use of the other items it does not object.

We will first discuss the objections to the tax on the use of the coal. It is agreed that the practices and conditions were substantially the same in the dealings with all the coal companies from which the coal involved was purchased. The coal purchases were made by plaintiff's manager telephoning to the Salt Lake agents of the coal companies, all of the mines of which were located outside of the State of Utah. The manager specified the sizes of coal and the date and time of shipment. It appeared that the agents of the coal companies accepted the orders and then forwarded directions to the mines for shipment.

Involved in the transactions were coal company "acceptance of order" forms which read in part as follows:

"This acceptance of order must be signed by seller to constitute a contract under conditions and terms shown above and on the reverse side. Sales agents have no authority to alter these conditions or bind the seller.

"*All sales are f. o. b. cars at mine or other indicated shipping point, and buyer shall pay all freight charges.*

"*Seller shall not be liable for any delay, loss, damage or charges after delivery of coal to carrier. * * *"* (Italics added.)

The Tax Commission found that the sales of coal were not made in the state of Utah and were therefore subject to the use tax rather than to the sales tax. Plaintiff contends the sales were made in Utah and admits that those made before March 18, 1943 are subject to the sales tax but as sales of coal for industrial purposes were exempted from the Sales Tax Act after March 18, 1943 (see Section 80-15-4, Laws of Utah 1943) that the sales after that date are not subject to the sales tax or the use tax.[1]

[1] The mere fact that the sale of personal property takes place in Utah does not exempt the use, storage or other consumption of that personal property from the Utah use tax. Mr. Justice McDonough,

speaking for this court in *Southern Pac. Co.* v. *Utah State Tax Commission,* 106 Utah 451, 150 P. 2d 110, on page 112 of the Pacific Report said:

> "Unless exempted under the provisions of 80-16-4 of the [use tax] act or prohibited by constitutional provisions, the use, storage, or other consumption of tangible personal property in Utah, *purchased here or elsewhere,* is liable to the use tax." (Italics added.)

## Were the sales of coal made in Utah? ■

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called a price." Section 81-1-1(2), U. C. A. 1943.

The essence of a sale is the transfer of title to the goods from the seller to the buyer. Sec. 5 Mariash on Sales. When title passes is a question of intention of the parties. Section 81-2-2, 3, U. C. A. 1943; 1 Williston, Sales 526. To determine that intention when it is not expressly shown rules have been set up in Chapter 2 of Title 81 of our Code. The sections applicable to the problem in this case are as follows:

Sec. 81-2-1.

"Where there is a contract to sell unascertained goods, no property in the goods is transferred to the buyer unless and until the goods are ascertained  *  *  *."

Sec. 81-2-3.

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

*     *     *     *     *     *

"Rule (4) (a) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be express or implied, and may be given either before or after the appropriation is made.

"(b) Where in pursuance of a contract to sell the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not) for the purpose of transmission to or holding

for the buyer, he is presumed to have unconditionally appropriated the goods to the contract, except in the cases provided for in the next rule and in section 81-2-4 [reservation of right of possession or property when goods are shipped]. \* \* \*

"Rule (5) If a contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or have reached the place agreed upon."

In the case at bar the parties to the sale of the coal did not expressly say when or where they intended title to the coal to be transferred. Applying the above rules we see that since the coal at the time the contract of sale was made was at the coal companies' mines and was not ascertained, no title could be transferred until the coal was ascertained. The coal was ascertained and unconditionally appropriated to the contract by the coal companies delivering it to the railroads at the mines. Plaintiff's consent to such appropriations was impliedly given by the "f. o. b." provisions of the sales contracts. Mariash in Section 155 of his work on Sales writes:

"The general rule, therefore, in 'f. o. b.' contracts is that property passes when the goods are free on board at the place named in the contract, and that place also is the place of delivery to the buyer."

In *Standard Casing Co.* v. *California Casing Co.*, 233 N. Y. 413, 135 N. E. 834, the court said:

"The general rule is that, upon a sale 'f. o. b. the point of shipment,' title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk. Williston Sales, § 280, p. 409; *United States* v. *R. P. Andrews & Co.*, 207 U. S. 229, 28 S. Ct. 100, 52 L. Ed. 185 \* \* \*. The operation of the rule is, of course, subordinate to intention."

The rule is stated in the annotation in 101 A. L. R. 293 as follows:

"Where the contract provides for a sale f. o. b. at the point of shipment, the title is generally held to pass, in the absence of a contrary

intention of the parties, at the time of the delivery of the goods for shipment at the point designated." See also 46 Am. Jur. 608.

The fact that the coal companies' acceptances of the orders provided that the "seller should not be liable for any delay, loss, damage or charges after delivery of coal to carrier" is another indication that title passed when the goods were delivered to the carrier at the mines, for risk of loss is generally on the title holder. Section 81-2-6, U. C. A. 1943; Williston on Sales, Vol. 1, page 692-694.

We hold that the Tax Commission did not err in finding the title to the coal involved in this case passed to the plaintiff when the coal was delivered f. o. b. to the carriers at the companies' mines. See *Middleton* v. *Evans et al.*, 86 Utah 396, 45 P. 2d 570.

The situs of a sale is where the act is performed or the event occurs which operates to vest title in the buyer. 46 Am. Jur. 582; Annotation 44 L. R. A., N. S., 450; *Wind* v. *Iler*, 93 Iowa 316, 61 N. W. 1001, 27 L. R. A. 219; *Brown* v. *Wieland*, 116 Iowa 711, 89 N. W. 17, 61 L. R. A. 417; *Loveland* v. *Dinnan*, 81 Conn. 111, 70 A. 634, 17 L. R. A., N. S., 1119.

The Tax Commission did not err in finding the sales of coal in this case did not take place in Utah.

Plaintiff contends that the application of the use tax law as made by the Tax Commission in reference to the coal is discriminatory against coal produced out of Utah and is, therefore, contrary to Art. 1, Sec. 8, Constitution of the United States. The applicable part of which section is as follows:

"The Congress shall have Power * * * to regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes."

In plaintiff's own words the contention is:

"The practical effect of the decision [of the Tax Commission] is to impose a 2% tax on coal consumed in Utah in industry but mined in Wyoming, while at the same time coal mined in Utah and consumed

in Utah industry bears no sales or use tax burden. Plaintiff asserts that the Tax Commission erred in holding the coal sales were subject to the use tax and not the sales tax and in holding that the use tax did not exempt industrial coal because the Utah leg. is without power to tax Wyoming coal and exempt Utah coal, and because as thus construed the law imposes a discriminatory burden on interstate commerce contrary to the mandate of the Federal Constitution." (Plaintiff's Brief, pp. 4, 5.)

It is apparent that plaintiff's contention of discrimination is based entirely on the assumption that

"coal mined in Utah and consumed in Utah industry bears no sales or use tax burden."

Said assumption is erroneous.

The Sales Tax Act was passed in 1933. It and its amendments are Chapter 15 of Title 80 of the Utah Code of 1943. The Use Tax Act was passed in 1937. It and its amendments are Chapter 16 of Title 80 of the Code. The Use Tax Act is separate and distinct from the Sales Tax Act though they are complements of each other. The 1943 Legislature amended Subsection (a) of Section 80-15-4 of the Sales Tax Act by inserting the words

"provided, however, that the sale of coal, fuel oil and other fuels shall not be subject to the tax except as hereinafter provided."

That same Legislature also amended Subsection (b) (2) of the same section by adding "coal, fuel oil or other fuels sold," so that the parts of the section as amended applicable to this case now read:

80-15-4.

"From and after the effective date of this act there is levied and there shall be collected and paid:

"(a) A tax upon every retail sale of tangible personal property made within the state of Utah equivalent to two per cent of the purchase price paid or charged, * * *, *provided, however, that the sale of coal, fuel oil and other fuels shall not be subject to the tax except as hereinafter provided.*

"(b) A tax equivalent to two per cent of the amount paid:

\* \* \* \* \* \*

"(2) To any person as defined in this act including municipal corporations for gas, electricity, heat, *coal, fuel oil or other fuels sold or* furnished for domestic or commercial consumption. \* \* \*" (Portions added by the amendment in italics.)

It appears, therefore, from all the provisions of Sec. 80-15-4 taken together that, first, sales of coal, etc., were exempt from the sales tax except as thereinafter provided. Second, it was thereinafter provided that coal, etc., used for domestic and commercial consumption were made subject to the sales tax, hence this left industrial coals, etc., not subject to the sales tax.

It is agreed by both the Commission and the plaintiff that before March 18, 1943, sales made in Utah of coal for any use were subject to the sales tax, but all parties agree because of the construction just above set out that by the above quoted amendment sales of coal for industrial use made in Utah after that date were exempted from the sales tax.

It must be borne in mind that the amended section became effective March 18, 1943 and that the amendment was to the Sales Tax Act and it did not change the Use Tax Act.

Because sales of Utah mined coal for industrial use made in Utah before March 18, 1943 were subject to the sales tax, the use of that coal was specifically exempted from the use tax by Sec. 4, Chap. 114, Laws of Utah 1937, now Sec. 80-16-4, U. C. A. 1943. The pertinent part of that section provides:

"The storage, use or other consumption in this state of the following tangible personal property is specifically exempted from the tax imposed by this act [Use Tax Act]:

"(a) Property, the gross receipts from the sale of which are required to be included in the measure of the tax imposed by chapter 63, Laws of Utah, 1933 [Sales Tax Act], and any amendments made or which may be made thereto.

\* \* \* \* \* \*

"(d) Property, the gross receipts from the sale, distribution or use

of which are now subject to a sale or excise tax under the laws of this state or of some other state of the United States."

Plaintiff contends that the use, storage or consumption in Utah of industrial coal sold in Utah was exempted from the use tax by either of the subsections above quoted after as well as before the enactment of the 1943 amendment to the sales tax.

Plaintiff would have subsection (a) of the use tax act next above quoted exempt from the use tax any class or type of property the sale of which was subject to the sales tax of this state at the time the use tax law was passed regardless of whether or not the sales tax law was ■ later amended to exempt that property from the sales tax. We do not interpret the subsection that way. Subsection (a) was enacted to prevent the sales tax and the use tax from being chargeable on the same articles of personal property; that is, to prevent the use tax from being applied to the use, storage or consumption of specific articles of personal property the gross receipts from the sale of which were subject to the sales tax. Since March 18, 1943 the gross receipts from the sales of industrial coal made in Utah have not been subject to the sales tax; therefore, the use, storage or other consumption of that industrial coal was not exempted by subsection (a) from the use tax. Hence plaintiff is in no way aided by subsection (a) because there is no showing that sales of the coal involved in this case were subject to the Utah sales tax.

Plaintiff would have subsection (d) quoted above exempt from the use tax property the gross receipts from the sale, distribution or use of which were subject to a sale or excise tax by any state of the union on July 1, 1937 (the date the subsection became effective). It argues the use of the word "now" by the legislature in the subsection fixes the exemption to property, the gross receipts from the sale, distribution or use of which were subject on the effective date of the subsection to a sales or excise tax, and therefore, as sales of coal in Utah for industrial purposes made July 1, 1937

were subject to the Utah sales tax, the use of Utah sold industrial coal was then and is now exempted from the use tax.

Plaintiff's entire argument that the use of Utah sold industrial coal is now exempt from the use tax under subsection (d) above is based on an erroneous interpretation of the meaning of the subsection. The clear intent of the legislature in passing subsection (d) was to prevent duplication of taxes and discrimination against property which was already subject to a tax comparable to the use tax. The subsection in effect says: If a sales or excise tax is charged by any state of the Union against the gross receipts from the sale, distribution or use of tangible personal property, the storage, use, or other consumption of that specific property in Utah is exempted from the Utah state use tax. The use in Utah of industrial coal sold in Utah is not exempted from the use tax by subsection (d) merely because the sales in Utah of industrial coal were subject to the Utah sales tax at the time the subsection became effective. Plaintiff's cause is in no way aided by subsection (d) because the gross receipts from the sale, distribution or use of the coal involved in this case are not shown to be subject to a sale or excise tax, other than the Utah use tax, of any state of the union.

The amendment to the sales tax statute effective March 18, 1943 removed sales made in Utah of coal for industrial use from operation of the Sales Tax Act. Removal of the sales from the Sales Tax Act also removed the previously enjoyed exemptions from the use tax of the use in industry of Utah purchased coal because no longer were the "gross receipts from the sale" of such coal "required to be included in the measure of the [sales] tax" and no longer were the "gross receipts from the sale" subject to a "sale or excise tax under the law of this state" and the use of said coal in industry in Utah is not exempted from the use tax by any of the other provisions of Sec. 80-16-4, U. C. A. 1943. The practical effect of the amendment was to make sales in Utah of coal for industrial use exempted

from the sales tax but the use of that coal in Utah subject to the use tax.

Before the amendment, sales made in Utah of industrial coal whether mined in Utah or elsewhere were subject to the Sales Tax Act and coal used in Utah industrially but not sold here was subject to the Use Tax Act. After the amendment coal industrially used in Utah regardless of where it was mined or where it was sold was subject to the Utah State Use Tax Act. Obviously the law is not discriminatory against coal mined out of Utah and in favor of Utah coal. Plaintiff's contention that the Commission's interpretation in this case of the use tax statute is discriminatory and therefore contrary to the commerce clause of the Federal Constitution is without merit.

Plaintiff further contends that if it is decided that the coal is subject to the use tax it should be exempted to the amount of its ash content because the ash content of the coal enters into and becomes part of the cement manufactured. Inasmuch as this is the same exemption claimed for the iron grinding balls and the firebrick all three will be discussed together.

The manufacturing of cement as carried on by the plaintiff and as shown by the record entails the use of steel or iron grinding balls which are purchased out of the state and which are used in plaintiff's grinding mills. Some of the grinding mills are used to grind up cement raw materials and others are used to grind up klinkers of cement after they have been compounded. In both uses the iron grinding balls are worn away; the particles of iron worn away becoming part of the cement. Both parties agree the purpose of the iron balls is to serve as a grinding agent rather than to provide iron for the cement though the iron may be beneficial to the cement and is sold as part thereof. It is also agreed that other equipment than iron balls could be used in the grinding process.

Firebrick which are bought out of the state are used by plaintiff to line its rotating kilns to protect the metal kilns from the intense heat inside. During the cement manufac-

turing process the firebrick lining is worn away by the abrasive action of the cement raw materials and klinkers against them. The particles worn away become part of the cement. Approximately three-fourths of each brick is thus worn away. The other one-fourth is discarded when the kiln is relined with new brick. Both parties agree the purpose of the firebrick is to be a refractory, to protect the kiln.

The coal involved in this case was pulverized, mixed with air and forced into the rotating kilns. The coal burns supplying the heat necessary to form the cement klinkers. The ash content of the coal does not burn but mixes with and becomes part of the cement klinkers and is ultimately sold as part of the cement. The coal is used to produce heat and not to add ash to the cement though plaintiff's formulae make allowances for the amount of ash thus added. It is agreed that other heat producing agents than coal could be used in manufacturing cement.

Thus it is undisputed that all the iron from the iron balls, three-fourths of the material from the firebrick, and the ash content of the coal become mixed with or part of the manufactured cement and are sold as such.

The statute providing for the claimed exemption to the use tax is as follows:

Section 80-16-4, U. C. A. 1943:

"The storage, use or other consumption in this state of the following tangible personal property is specifically exempted from the tax imposed by this act:

*    *    *    *    *    *

"(h) Property which enters into and becomes an ingredient or component part of the property which a person engaged in the business of manufacturing, compounding for sale, profit, or use manufactures or compounds, or the container, label or the shipping case thereof."

The cases cited by counsel are not helpful as they were either decided on other grounds or under different statutes from ours or their facts do not fit those of this case. The search by the court for cases exactly in point has been fruitless. This court has never construed subsection (h)

of Section 4 of the Use Tax Act as quoted above. However, we have construed subsection (f) of Section 2 of the Sales Tax Act (Chapter 15 of Title 80, U. C. A.) which subsection, excluding the part dealing with agricultural matters, is substantially the same as subsection (h) above.

In *Salt Lake Union Stock Yards* v. *State Tax Comm.*, 93 Utah 166, 71 P. 2d 538, 539, Mr. Justice Folland speaking for this court reviewed the legislative development of subsection (f) of Chapter 2 of the Sales Tax Act and interpreted it as follows:

"At the Second Special Session of the Legislature of 1933, the above section [2 (f) of Sales Tax Act] was amended by Chapter 20 (page 36) as follows:

" '(f) Each purchase of tangible personal property or product made by a person engaged in the business of manufacturing, compounding for sale, profit or use, any article substance or commodity *which enters into and becomes an ingredient or component part of the tangible personal property or product which he manufactures or compounds or the container, label, or the shipping case thereof* shall be deemed a wholesale sale and shall be exempt from taxation under this act. (New matter in italics)'

\*    \*    \*    \*    \*    \*

"Section 2 of the first enactment merely exempted as a wholesale sale tangible personal property sold to persons engaged in the business of manufacturing or combining for sale, profit, or use, any articles for use in such business. The purpose and effect of the first amendment [in italics above] is quite obvious. Under the original act all the purchases of the manufacturer, if for the use in his business, were exempt from payment of the sales tax. Purchases of articles which were used or consumed and which did not go into the articles manufactured were not taxable. This was not in harmony with the sales tax theory that while the tax should not be exacted more than once, it should be paid at least once; hence the amendment, which exempted from payment of the tax any article, substance, or commodity which enters into and becomes an ingredient or component part of the product manufactured or compounded."

Thus the court indicates that the exemption of property which "enters into and becomes an ingredient or component part of the" tangible personal property manufactured does

not apply to items which are *consumed* by the manufacturer and which do not go into the articles manufactured.

In the recent case of *E. C. Olsen Co.* v. *State Tax Comm.,* 109 Utah 563, 168 P. 2d 324, 330, this court said:

"The test is: Are the articles involved consumed by the processor as the last user? If they are so consumed, the [sales] tax must be paid thereon by the processor. On the other hand, if the articles enter into and become an ingredient or component part of what he manufactures, and are thus passed on to the final user, or the articles are containers, labels, or shipping cases of what he manufactures, the processor does not pay the tax."

Our interpretation of subsection (h) of 80-16-4 is the same as we interpreted subsection (f) of section 2 of the Sales Tax Act in the cases cited above. The subsection exempts from the use tax property which enters into and becomes an ingredient or component part of the property manufactured, which is thus passed on to an ultimate user. It does not exempt property which is consumed by the manufacturer as last user.

Applying that test to the case at bar the question arises: Who was the consumer of the "iron grinding balls," "firebrick" and "coal?"

"The word 'consume' is thus defined in Webster's New International Dictionary, Second Edition: '1. To destroy the substance of, esp. by fire;—formerly and still figuratively used of any destructive or wasting process, as evaporation, decomposition, and disease. 2. To spend wastefully; hence, to use up; expend; waste. 3. To use up (time) whether wastefully or usefully; as, hours consumed in reading. 4. To eat or drink up (food); devour. 5. To waste or burn away; to perish. Syn.—absorb, spend, squander, dissipate.'" *Western Leather & Finding Co.* v. *State Tax Commission,* 87 Utah 227, 48 P. 2d 526, 528.

"Consumer" is defined as "one who uses economic goods and so diminishes or destroys their utilities; opposed to producer; and 'consume' means to use up, expend, waste, devour, with synonyms destroy, swallow up, engulf, absorb, waste, exhaust, spend, expend, squander, lavish, dissipate, burn up." 9 Words and Phrases, Permanent Edition, 10.

In the process of manufacturing cement the "iron grinding balls" were consumed; they were worn away; they

were used up. The "iron grinding balls" were not passed on to other users by plaintiff. Minute particles of iron result from the consumption or wearing away of the iron balls.

"Firebrick" were likewise consumed in the manufacturing process. Resulting from this consumption, that is after "firebrick" had been used until they no longer could serve the purpose of firebrick, were one-fourth size brick and minute particles of silica and other compounds from which the brick was originally made. The "firebrick" were not passed on by plaintiff to other users.

The coal was consumed by burning in the manufacturing process. Its consumption resulted in heat, gases and ashes. The coal was not passed on to other users. The principal use of the coal was to supply heat. Only incidentally to that principal use did ashes from the coal enter into the finished product.

It is true that all the iron particles resulting from the consumption of the "iron grinding balls" enter into and become an ingredient or component part of the cement and were passed on to the purchasers of the cement. The same is true of three-fourths of what resulted from the consumption of the "firebrick." The same applies to ashes which were left after the coal was burned. However, the "property" plaintiff seeks to exempt from the use tax under subsection (h) of 80-16-4 is "iron grinding balls," "firebrick," and "coal." It does not seek exemption on the use of elements and compounds left after the balls, brick and coal had been used and consumed until they had no value or use whatsoever as "iron grinding balls," "firebrick" or "coal." The tax Commission did not assess the use of those resulting elements and compounds. The assessment was for the use and consumption of *coal, iron grinding balls* and *firebrick*. These items were used and consumed by the plaintiff until they ceased to have any potential use as *coal, iron grinding balls* and *firebrick*.

The "iron grinding balls" and "firebrick" were, in effect, parts of plaintiff's manufacturing machinery just as were the grinding mills in which the balls were used and the metal

kilns which were lined with the brick. Conceivably the grinding mills themselves were worn by the abrasive action of the balls and cement. The minute particles worn from the mills entered into the cement just as did the particles worn from the iron balls. In other manufacturing processes comparable situations exist. Conveyer belts, metal and wooden chutes, table and bench tops, and the like are worn away by abrasive action of raw materials and finished products and the particles so worn away enter into the manufactured items. The same is true in some manufacturing processes of cutting blades, grinding rollers and retort furnace linings. However in all those cases the minute particles worn away enter into the finished products only incidentally to the manufacture of those products. The statutes of this state do not exempt machinery used in manufacturing processes from the use or sales tax. The fact that a machine used in the manufacturing process is worn away in whole or part during the manufacturing process and the materials resulting incidentally enter into the products manufactured does not exempt the manufacturer from either the sales or use tax on the purchase or use of that machine.

The order of the Tax Commission making the deficiency assessment against the plaintiff is affirmed. No costs allowed.

McDONOUGH, PRATT, and WADE, JJ., concur.

LARSON, Chief Justice (concurring).

I concur in holding that the coal involved in this action was not acquired by sales made in Utah, and so is subject to the use tax. I also agree that neither the coal, firebrick nor grinding balls are exempt from the tax. I therefore concur in affirming the commission.