**GULL LABORATORIES, INC.,**
**Petitioner and Appellant,**

v.

**UTAH STATE TAX COMMISSION, AUDITING DIVISION, Respondent and Appellee.**

No. 960792–CA.

Court of Appeals of Utah.

April 3, 1997.

John M. Bradley and Thomas R. Barton, Salt Lake City, for Appellant.

Jan Graham and Gale K. Francis, Salt Lake City, for Appellees.

Before WILKINS, BENCH and JACKSON, JJ.

JACKSON, Judge:

Gull Laboratories, Inc. (Gull) appeals the Utah State Tax Commission's decision that Gull must pay sales tax on certain material bought to help make medical diagnostic test kits (kits). We affirm.

BACKGROUND

Gull makes kits which are used by doctors and hospitals to treat patients. The kits contain antigen slides, conjugate with counterstain, positive and negative control sera, "PBS powder," mounting fluid, and instruc-

tions. An antigen slide is a glass slide upon which a thin layer of human cells has been spread. Using the other items in the kit, medical personnel apply a patient's serum to the cells on the slide to detect certain infections or diseases. Based on the results, a doctor may make a diagnosis and recommend a course of treatment.

Gull grows the cells by placing about one hundred thousand cells in a flask, adding fluid known as "culture media," and then sealing the flask and putting it in an incubator. In three to seven days, the cells grow and multiply into about ten to twenty million cells. When the process is complete, Gull personnel harvest the surviving cells,[1] affixing about half to the glass slides contained in the kits, while retaining the other half in storage flasks.

The culture media is made of purified water and serum combined with "media mix," which is a powder containing salts and minerals, amino acids, sugars, proteins, vitamins, hormones, and "other growth factors." By volume, only one percent of the culture media is actually media mix.[2] The cells must ingest elements of the media mix to grow and divide. For example, the cells use proteins and amino acids to make their cell walls, and they use sugars to produce energy to grow and divide. Some elements of the media mix—e.g., salts and some minerals, which constitute a large portion of the media mix—are used more to create an environment for the cells than to provide building blocks for the cells. Other elements—e.g., the amino acid glutamine—have very short half-lives

and disintegrate before the cells can use them.

As the cells grow and divide, they excrete waste back into the culture media. When the waste reaches toxic levels, the culture media is poured off and disposed of. New culture media is then added or the cells are harvested.

It is undisputed that Gull has paid sales tax on its purchases of purified water, serum, and other catalysts used in producing the kits and that Gull properly assesses sales taxes on its retail sales of the kits. However, Gull did not pay sales taxes assessed on its media mix purchases, arguing those purchases are exempt from taxation because the nutrients in the media mix become "component parts" or "ingredients" of the cells in the kits. See Utah Code Ann. § 59–12–104(27) (1996).[3] From July 1991 through June 1994, the assessed tax on the media mix purchases was $4130.90, including related interest.

The Commission held a formal hearing to consider Gull's arguments, then issued its decision requiring Gull to pay sales tax on media mix purchases. In its decision, the Commission determined that Gull could not qualify for the "component-part exemption" because that exemption applies only to agricultural entities. Citing *Nucor Corp. v. Utah State Tax Commission*, 832 P.2d 1294 (Utah 1992), and *Union Portland Cement Co. v. State Tax Commission*, 110 Utah 135, 170 P.2d 164 (1946), the Commission further concluded that the media mix purchases are

---

1. About 10% of the cells die by harvest time.

2. The culture media is 1% media mix, 89–94% purified water, and 5–10% serum. The cells make up only about .1% of the volume of the flasks' contents. The amount of the media mix's elements contained in the cells is unknown.

3. Section 59–12–104(27) exempts from sales tax "property purchased for resale in this state, in the regular course of business, either in its original form or as an ingredient or *component part* of a manufactured or compounded product." Utah Code Ann. § 59–12–104(27) (1996) (emphasis added).

The definition of "component part" is found in Utah Code Ann. § 59–12–102(6) (1996):
"Component part" includes:

(a) poultry, dairy, and other livestock feed, and their components;
(b) baling ties and twine used in the baling of hay and straw;
(c) fuel used for providing temperature control of orchards and commercial greenhouses doing a majority of their business in wholesale sales, and for providing power for off-highway type farm machinery; and
(d) *feed*, seeds, and seedlings.
(Emphasis added.)

The taxes were assessed for the period July 1991 through June 1994. Thus, the laws effective during that time control this case. For the convenience of the reader, however, we cite to the current codification of the tax statutes, which are in substance the same for purposes of this case.

taxable because the mix is consumed in the manufacturing process and the nutrients from the mix are only incidental ingredients of the cells in the kits.

Gull appeals the Commission's decision, arguing (1) the Commission incorrectly determined only agricultural entities may use the component-part exemption;[4] (2) media mix purchases are exempt from taxation solely because the mix is "feed" within the definition of "component part" found in Utah Code Ann. § 59–12–102 (1996); and (3) the Commission was incorrect in essentially concluding that Gull must pay sales tax because it is the ultimate consumer of the media mix.

## ANALYSIS

### I. "Feed"

■ Whether media mix is "feed" under Utah Code Ann. § 59–12–102(6) (1996), *see supra* note 3, "is a matter of statutory construction and therefore is a conclusion of law." *Cache County v. Property Tax Div. of Tax Comm'n*, 922 P.2d 758, 764 (Utah 1996). Thus, because this statute grants the Commission no discretion in its interpretation, even if the Commission had determined this issue, we would not have deferred to the Commission and would have applied "a correction of error standard." Utah Code Ann. § 59–1–610(1)(b) (1996).

Our analysis is guided by several well-settled canons of statutory construction:

First, we construe statutes that grant exclusions from taxation strictly against the party seeking an exemption, and that party accordingly bears the burden of proving that it qualifies for the exemption sought. Second, in construing any statute, "'we first examine the statute's plain language and resort to other methods of statutory interpretation only if the language is ambiguous.'" Accordingly, we read the words of a statute literally unless such a reading is unreasonably confused or inoperable, and give the words their usual and accepted meaning. Third, the reviewing court does not look beyond plain and unambiguous language to ascertain legislative intent. Finally, we presume that the "statute is valid and that the words and phrases used were chosen carefully and advisedly."

*US Xpress, Inc. v. Utah State Tax Comm'n*, 886 P.2d 1115, 1117 (Utah.Ct.App.1994) (citations omitted).

The Legislature has not defined "feed" for purposes of the exemption at issue. Thus, we rely on the dictionary to divine the "usual meaning" of "feed." *Morton Int'l, Inc. v. Auditing Div. of Utah Tax Comm'n*, 814 P.2d 581, 590 (Utah 1991); *accord OSI Indus., Inc. v. Utah State Tax Comm'n*, 860 P.2d 381, 384 (Utah.Ct.App.1993). Our dictionary research shows that "feed" typically means "[f]ood for animals and birds; fodder," *American Heritage Dictionary* 495 (2d ed. 1985); "food given to animals," *Webster's New Universal Unabridged Dictionary* 672 (2d ed. 1983).

---

**4.** Because we determine in this opinion that media mix is not "feed" within the meaning of Utah Code Ann. § 59–12–102(6)(d) (1996), and that media mix is not otherwise exempt as "an ingredient or component part" under Utah Code Ann. § 59–12–104(27) (1996) as it is not "purchased for resale," we need not reach the issue of whether only agricultural entities qualify for the component-part exemption.

The Commission decided this case the other way around—it determined only agricultural entities can use the component-part exemption and Gull is not an agricultural entity. Thus, it did not determine if media mix is "feed" within the definition of "component part" found in Utah Code Ann. § 59–12–102(6) (1996).

However, in its findings of fact, the Commission did find "[t]he culture media [containing media mix] provides the *foodstuffs* [and] nutrients for the cells to grow and divide." (Em-

phasis added.) This finding, however, does not lead to the conclusion that media mix is "feed," because "foodstuffs" is a much broader term, meaning "a substance that can be used or prepared for use as food." *American Heritage Dictionary* 521 (2d ed. 1985). And, even if the "finding" that culture media/media mix is "foodstuffs" were to necessarily lead to the conclusion that culture media/media mix is "feed," that "finding" would actually be a conclusion of law because it determines the ultimate question of statutory construction regarding the meaning of "feed" in section 59–12–102(6)(d). *See Gillmor v. Wright*, 850 P.2d 431, 433 (Utah 1993) ("On appeal, we disregard the labels attached to findings and conclusions and look to the substance."). Thus, we would review this conclusion of law nondeferentially for correctness. *See* Utah Code Ann. § 59–1–610(1)(b) (1996).

Gull, however, would have us read "feed" far more liberally to include the nutrients it uses to grow cells for kits. Gull's argument is based on the appearance of "feed" in both subsections (a) and (d) of section 59–12–102(6). *See* Utah Code Ann. § 59–12–102(6) (1996). Gull notes that subsection (a) functions to exempt "poultry, dairy, and other livestock feed, and their components" from sales taxation, while subsection (d) functions to exempt "feed, seeds, and seedlings." *Id.* Thus, Gull argues the former subsection covers the usual meaning of "feed," leaving the latter subsection entirely unrestricted to include unconventional "feeds," such as "manufacturing feedstock, food for other organisms raised for commercial purposes, and food in general."

We reject Gull's interpretation of "feed," concluding that the dictionary definition—"food for animals and birds"—better comports with the rules governing our interpretation of this statute in three ways. First, the rule that we must strictly construe tax exemption statutes against those seeking exemptions requires us to adopt the more narrow definition consistent with the statute's plain language as opposed to the broad, seemingly wide-open definition proposed by Gull. *See US Xpress,* 886 P.2d at 1117. Using Gull's definition, active imaginations would no doubt find ways to fit endless items into this exemption. We must interpret the statute here to guard against that result.

Second, the dictionary definition of "feed" is in harmony with the general theme of the other subsections, which relate to materials used in the commercial production of animals and plants.[5] Gull's definition, on the other hand, would lead to the "unreasonably confused or inoperable" reading we are required to avoid. *Id.* at 1118. It would create a lone—potentially huge—general category in a field of otherwise fairly specific categories in this definitional section. *See supra* note 3. Were we to allow such a sweeping definition of "feed" as that proposed by Gull, the congruence of the materials listed in section 59–12–102(6) would be spoiled.

Finally, we are unpersuaded by Gull's contention that "feed" in subsection (d) must have an unusual, expansive definition because "poultry, dairy, and other livestock feed" is already found in subsection (a).[6] *See* Utah Code Ann. § 59–12–102(6) (1996). "Food for animals and birds" is broader than "livestock

---

**5.** "The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood or what understanding they convey when used in the particular act." 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.06, at 127 (5th ed. 1992).

**6.** The forerunner to section 59–12–102(6) read:

[F]or the purpose of this act, poultry, dairy and other livestock feed, and the components thereof, including all baling ties and twine used in the baling of hay and straw and all fuel used for heating orchards, commercial greenhouses, doing a majority of their business in wholesale sales, and providing power for off-highway type farm machinery, and all seeds and seedlings, are deemed to become component parts of the eggs, milk, meat and other livestock products, plants and plant products, produced for resale; and each purchase of such feed or seed from a wholesaler, or retailer, as well as from any other person shall be deemed a wholesale sale and shall be exempt from taxation under this act. . . .

Utah Code Ann. § 59–15–2(f) (1974). Gull contends that the Legislature intended to broaden the definition of "feed" when it later broke this section into the subsections now found in Utah

Code Ann. § 59–12–102(6) (1996). However, our research of the legislative history related to that change shows no such intent. In fact, the legislative record is completely silent as to this particular change, which was made as part of a much larger overhaul, when the Legislature combined and recodified the sales and use tax code. *See* Recording of Utah House Floor Debates, 47th Legislature, Gen. Session (January 28, 1987); Recording of Utah Senate Floor Debates, 47th Legislature, Gen. Session (January 15–16, 1987). Because the change was merely the result of recodification, no legislative intent was expressed.

Also, although the categories found in subsections (a) and (d) of section 59–12–102(6) may potentially overlap in some ways, we do not view our interpretation as creating an impermissible superfluity. *See Beynon v. St. George–Dixie Lodge # 1743,* 854 P.2d 513, 518 n. 21 (Utah 1993) (stating we avoid superfluity *"[w]henever possible"* (emphasis added)). The other reasons we state warrant our adoption of the narrower, more ordinary definition of "feed" for subsection (d). *Cf.* 2A Singer, *supra* note 5, § 46.06, at 120 (stating "words and clauses which are present in a statute only through inadvertence can be disregarded if they are repugnant to what is found, on the basis of other indicia, to be the legislative intent").

feed." Considering that the Legislature is presumed to have used these terms advisedly, we assume that the Legislature wanted to clearly exempt feed for traditional farm animals [7] and yet wanted to also include a broader category of feed for other types of animals and birds raised commercially.[8]

We therefore conclude media mix is not "feed" for purposes of subsection (d). Thus, media mix purchases do not automatically qualify for an exemption under the definition of "component part" found in section 59–12–102(6), and we must conduct further analysis under section 59–12–104(27).

## II. "Purchased for Resale"

 It is undisputed that the cells in the kits contain as ingredients elements of the media mix. However, just because a manufacturer buys a material that becomes an ingredient or component part in a final product does not mean that purchase is exempt from sales tax under section 59–12–104(27). *See* Utah Code Ann. § 59–12–104(27) (1996). We therefore shift our focus to the critical requirement that ingredients found in manufactured products be "purchased for resale" to qualify for exemption. *Id.; see also Nu-*

cor Corp. v. Utah State Tax Comm'n, 832 P.2d 1294, 1296 (Utah 1992).[9]

To determine whether the media mix was indeed "purchased for resale," we must evaluate Gull's purpose for buying the mix and its use of the mix. *See Nucor*, 832 P.2d at 1297. " '[T]he plain meaning of the words "purchased for resale" implies that a company's purpose in buying an item must be to resell that item.' " *Broadcast Int'l, Inc. v. Utah State Tax Comm'n*, 882 P.2d 691, 696 (Utah.Ct.App.1994) (citation omitted). The essential consideration in determining whether the purchased-for-resale exemption applies is the "primary purpose of the purchase, not who eventually ended up with the items." *Id.* at n. 4.

Thus, if Gull's purpose is to effectively consume the media mix in the manufacturing process, and the mix becomes only an incidental ingredient of the kits, then the mix is not "purchased for resale," and mix purchases are not exempt. *See Nucor*, 832 P.2d at 1297–98. However, if Gull passes the media mix along to its customers when they buy kits—the final products—then the media mix is "purchased for resale," and mix purchases are exempt. *See id.* at 1297. After

---

7. Following an apparent policy of promoting the farming industry, the Legislature has taken care to exempt many items used specifically in farm operations from the sales and use tax by creating a distinct exemption just for farming. *See* Utah Code Ann. § 59–12–104(21) (1996).

8. We note, for the sake of information only, that many other states also exempt feed from sales and use taxes. *See, e.g.,* Cal. Rev. & Tax.Code § 6358(b) (West Supp.1997); Ga.Code Ann. § 48–8–3(25) (Supp.1996); Ind.Code Ann. § 6–2.5–5–1 (Michie 1995); Kan. Stat. Ann. §§ 79–3606(m) (Supp.1996) (component-part exemption) & 79–3602(*l*)(6) (Supp.1996) ("component part" includes "feed"); Md.Code Ann., Tax–Gen. § 11–201(a)(2) (1988); Okla. Stat Ann. tit. 68, § 1358(4) (West Supp.1997); S.C.Code Ann. § 12–36–2120(5) (Law Co-op. Supp.1996); Tex. Tax Code Ann. § 151.316(a)(3) & (4) (West Supp. 1997); Wyo. Stat. Ann. § 39–6–405(a)(iii)(B) (Michie Supp.1996). Our survey of their statutes and cases has revealed no other instance in which "feed" was read to apply to anything but animals. *See, e.g., Pedersen v. Green,* 105 So.2d 1, 4 (Fla.1958) (holding "feeds" as used in statute exempting feeds from sales tax was not restricted to feed for agricultural animals, but could also be applied to food purchases for zoo animals).

9. In *Nucor Corp. v. Utah State Tax Commission,* 832 P.2d 1294 (Utah 1992), the supreme court determined section 59–12–104(27) contained an implicit grant of discretion to the Commission in interpreting the statutory language "purchased for resale." *See id.* at 1296. Therefore, it reviewed the Commission's decision under an abuse-of-discretion standard. *See id.* at 1296–97. Since that time, however, the Legislature has enacted Utah Code Ann. § 59–1–610(1)(b) (1996), which "grant[s] the commission no deference concerning its conclusions of law [including statutory interpretation], ... unless there is an explicit grant of discretion contained in a statute at issue." Because section 59–12–104(27) contains no such explicit grant of discretion, our standard of review has been changed to correction of error. *See* Utah Code Ann. § 59–1–610(1)(b) (1996). However, our analysis of "purchased for resale" is still guided by the analysis in *Nucor,* in which the court not only concluded the Commission did not abuse its discretion, but expressly validated the Commission's analysis of the language, which was based on the earlier supreme court case of *Union Portland Cement Co. v. State Tax Commission,* 110 Utah 135, 146–51, 170 P.2d 164, 171–72 (1946). *See Nucor,* 832 P.2d at 1297.

all, the purpose of the sales tax statute is to place "the tax burden upon the ultimate consumers of products." *Id.; see also BJ–Titan Servs. v. State Tax Comm'n*, 842 P.2d 822, 825–26 (Utah 1992) ("The legal question posed is, who is the ultimate 'user or consumer' of the tangible personal property? ... This analysis is based on a presumed legislative intent to tax the last possible transaction.").

In the *Nucor* case, Nucor owned a steel mill where it converted scrap metal into steel products in three steps—melting, refining, and rolling or shaping the steel. *See* 832 P.2d at 1295. At the melting stage, Nucor used iron lance pipes and stirring lances to inject gases into the molten metal to increase temperatures. *See id.* During that process, the pipes and lances melted and became ingredients in Nucor's finished steel products. *See id.* Likewise, during the rolling process, flakes of steel from the mill rolls wore off and became ingredients of the final steel products. *See id.* After the rolls wore down to a certain level, the remaining rolls were removed and used as raw material or scrap for later processing. *See id.*

Nucor argued its purchases of lance pipes, stirring lances, and mill rolls were exempt because they were ingredients in its final products. However, the supreme court disagreed, concluding Nucor bought the materials

as a final consumer of those items. Nucor purchased and used the items as lance pipes, stirring lances, and mill rolls, not as raw iron.... The items were purchased for their value as equipment to aid in the manufacturing process; their value as ingredients in the end product was incidental.

*Id.* at 1297–98. Thus, although the melted equipment actually supplied a portion of the iron necessary to the final product, the court determined that portion to be incidental in view of Nucor's purpose of buying the equipment for the manufacturing process. *See id.* at 1298.

The analysis in *Nucor* was derived from the earlier case of *Union Portland Cement Co. v. State Tax Commission*, 110 Utah 135, 170 P.2d 164 (1946). Union Portland made

cement, using iron grinding balls, firebrick, and coal. *See id.* at 171. In the process, the grinding balls completely wore away, with the consequent iron particles becoming ingredients or component parts of the cement, passed on to customers. *See id.* at 171–72. Likewise, most of the firebrick and coal ashes found its way into the final product. *See id.* However, the court determined Union Portland was the final consumer of the balls, firebrick, and coal, and upheld the tax assessed on their purchase. *See id.* at 172. The court reasoned that Union Portland did

not seek exemption on the use of elements and compounds left after the balls, brick and coal had been used and consumed until they had no value or use whatsoever as "iron grinding balls," "firebrick" or "coal." The Tax Commission did not assess the use of those resulting elements and compounds. The assessment was for the use and consumption of *coal, iron grinding balls* and *firebrick.* These items were used and consumed by [Union Portland] until they ceased to have any potential use as *coal, iron grinding balls* and *firebrick.*

*Id.*

In this case, as in *Nucor* and *Union Portland*, elements of the media mix, such as sugars and amino acids, find their way into the cells in the final products—the kits. Those elements *do* become ingredients of the cells. However, the Commission did not assess a tax on those trace elements. The assessment was on Gull's purchases of the media mix, which was used and consumed by Gull until it ceased to have any further potential use as media mix. As in *Union Portland*, in which the "iron grinding balls" and "firebrick" were "consumed," "worn away" and "used up," so that the "iron grinding balls" and "firebrick," as such, "were not passed on to other [consumers] by [the manufacturer]," *Union Portland*, 170 P.2d at 171–72, Gull consumes and uses up the media mix in the process of growing cells, so that the "media mix," as such, is not passed on to the kits' consumers. Thus, Gull is the ultimate user of the media mix and bought it for its value as an "aid in the manufacturing process." *Nucor*, 832 P.2d at 1298. The mix's value as residual, disparate elements

found in the final product is only incidental. *See id.*

Further, unlike the tax-exempt purchases of parts that a manufacturer in another case used to assemble water pumps, Gull's manufacturing process *does* "alter the identit[y] of the part[ ]"—the media mix. *BJ–Titan,* 842 P.2d at 826 (citing *Nickerson Pump & Mach. Co. v. State Tax Comm'n,* 12 Utah 2d 30, 361 P.2d 520 (1961)). The media mix is unidentifiable as media mix in Gull's final product. And, like the materials dentists buy for their practices, on which they must pay sales tax, media mix "cannot practically be itemized for individual [customers]" because the amount of media mix the cells actually contain is unknown. *Id.* (citing *Hardy v. State Tax Comm'n,* 561 P.2d 1064 (Utah 1977)). Thus, Gull, akin to dentists, is "the last person[ ] in the property chain who can be taxed." *Id.* Finally, comparable to building materials bought by contractors, Gull is "the last person[ ] in the property chain to deal with the products before incorporation into a separate entity [i.e., the cells] and before the products lose their identity as building materials [i.e., media mix]." *Id.* (citing *Barrett Inv. Co. v. State Tax Comm'n,* 15 Utah 2d 97, 387 P.2d 998, 1000 (1964)). Like Gull, contractors buy materials "not to resell them in their original form, but for the purpose of changing their nature"—contractors build personal property into real property, while Gull builds elements of media mix into cells. *Id.*

Accordingly, given Gull's primary purpose in buying and using media mix, we conclude media mix is not "purchased for resale" by Gull under section 59–12–104(27). Thus, the Commission was correct to uphold the assessment of sales tax on Gull's media mix purchases.

## CONCLUSION

We conclude media mix is not "feed" under Utah Code Ann. § 59–12–102(6)(d) (1996). We further conclude media mix is not "purchased for resale" under Utah Code Ann. § 59–12–104(27) (1996). The Commission therefore correctly determined that Gull's

media mix purchases are not exempt from sales tax. Accordingly, we affirm.

WILKINS, Associate P.J., and BENCH, J., concur.